Argued October 29, 1975, reversed June 4, petition for rehearing denied
July 13, 1976

BERNARD et al, *Respondents,*

*v.*

FIRST NATIONAL BANK OF OREGON,
*Appellant.*

(Case No. 397-001)

HALLINAN LUMBER COMPANY, *Respondent,*

*v.*

UNITED STATES NATIONAL BANK OF
OREGON, *Appellant.*

(Case No. 397-498)

550 P2d 1203

*Norman J. Wiener* and *Fredric A. Yerke,* Portland, argued the cause for appellant First National Bank of Oregon. With them on the briefs were R. Alan Wight, and Miller, Anderson, Nash, Yerke & Wiener, Portland.

[ 146-a ]

*William M. McAllister,* Portland, argued the cause for appellant United States National Bank of Oregon. With him on the briefs were Charles F. Hinkle, and Davies, Biggs, Strayer, Stoel and Boley, Portland.

*Albert E. Levy,* Portland, argued the cause for respondents. On the brief were Henry A. Carey, Jr., Brad Littlefield, and Goldsmith, Siegel, Engel & Littlefield, Portland.

Before O'Connell, Chief Justice, and Denecke, Holman, Tongue, Howell, and Bryson, Justices.

HOLMAN, J.

## HOLMAN, J.

Plaintiff Bernard and three other plaintiffs filed an action on behalf of themselves and all other borrowers similarly situated against the First National Bank of Oregon to recover "overcharges of interest." Plaintiff Hallinan Lumber Company filed a similar class action against the United States National Bank of Oregon, and the cases were consolidated for trial. The trial court entered an order allowing the actions to proceed as class actions and, pursuant to ORS 13.400, certified the order as one appropriate for an immediate interlocutory appeal to this court. We granted the application of each defendant to entertain the appeal.

The focus of the dispute in these class actions is the defendant banks' practice of computing interest on certain loans on the basis of a 360-day year rather than on the actual year of 365 days, a method of computation commonly referred to as the "365/360 method" or "ordinary simple interest."[1] The named plaintiffs are borrowers from the banks who allegedly were charged interest by the 365/360 method. They seek to represent all other borrowers who were charged interest on the same basis during the period of the applicable statute of limitations.

The affidavits, depositions and documentary evidence submitted to the court below reveal that the defendant banks employ three different methods of computing interest depending upon the classification of the type of loan. Two of these methods, referred to as the "365/365" and "360/360" methods, produce the same amount of interest over a 365-day year without any distortion of the nominal interest rate. The third way, the "365/360" method which is at issue here, pro-

---

[1]This banking practice has been a fertile source of litigation of late. *See, e.g., American Timber & Trading Co. v. First Nat'l Bank,* 511 F2d 980 (9th Cir 1974), *cert. denied,* 421 US 921, 95 S Ct 1588, 43 L Ed 2d 789 (1975); *Perlman v. First National Bank of Chicago,* 15 Ill App 3d 784, 305 NE2d 236 (1973); *Holisak v. Northwestern Nat'l Bank of St. Paul,* 297 Minn 248, 210 NW2d 413 (1973); *Silverstein v. Shadow Lawn Sav. & Loan Ass'n,* 51 NJ 30, 237 A2d 474 (1968).

duces a greater amount of interest over a period of 365 days than either of the two other methods. In effect, the 365/360 method assesses the nominal yearly rate of interest every 360 days. Thus, over a 365-day period, the *actual* interest rate exceeds the nominal interest rate by 1/72, or 1.388 per cent, of the nominal interest rate. For example, interest at the nominal rate of 8 per cent per annum computed by the 365/360 method results in 8.11 per cent interest being returned over a 365-day period.[2]

The 365/360 method is apparently used by defendants only for "commercial" loans, whereas either the 365/365 or 360/360 method is employed for real estate and consumer credit loans. None of the parties has described exactly the kinds of borrowers to which "commercial" loans are made. In any event, the class has been defined as all borrowers who were charged interest on a 365/360 basis, rather than all commercial loan borrowers.

Plaintiffs seek to recover on alternative theories of breach of contract and money had and received. The complaints allege that plaintiffs and the members of the class entered into written loan agreements with the defendant banks which included substantially identical provisions stating that the borrower promised to pay interest "at the rate of —— percent per annum;" that the banks failed to disclose, and plaintiffs and members of the class had no knowledge, that the banks computed interest on the basis of a 360-day year; and that interest was charged and paid on that basis of computation. Plaintiffs estimate that the borrowers within the class in the combined cases number 70,000 and seek a total recovery of $8,000,000 ($4,000,000 from each bank).

The banks deny the material allegations of the complaints. More importantly, they deny that they failed

---

[2] A full discussion of the three methods of interest calculation and their effects is found in Note, *Legal Aspects of the Use of "Ordinary Simple Interest,"* 40 U Chi L Rev 141 (1972), and in Silverstein v. Shadow Lawn Sav. & Loan Ass'n, 51 NJ 30, 237 A2d 474 (1968).

to disclose, and that the borrowers lacked knowledge of, the banks' practice of computing interest on a 360-day year basis.

After considering the affidavits, depositions, and documentary evidence submitted by the parties, the trial court made findings of fact and conclusions of law that the requirements of ORS 13.220(2)(c) for maintenance of a class action had been met. Defendants appeal from the order allowing the action to proceed as a class action.

The principal issue on appeal is whether the cases are proper ones for class action under ORS 13.220(2)(c), which requires, as a condition to maintenance of such an action for money damages, that common questions of law or fact predominate over questions affecting only individual members of the class. In this case such issue turns on whether it is "likely" that final determination of the action will require separate adjudications concerning the knowledge of "numerous" plaintiffs that the banks charged interest by the 365/360 methode ORS 13.220 provides:

"*13.220 Requirement for class action; when maintainable.* (1) One or more members of a class may sue or be sued as representative parties on behalf of all only if:

"(a) The class is so numerous that joinder of all members is impracticable; and

"(b) There are questions of law or fact common to the class; and

"(c) The claims or defenses of the representative parties are typical of the claims or defenses of the class; and

"(d) The representative parties will fairly and adequately protect the interests of the class; and

"(e) In an action for damages under paragraph (c) of subsection (2) of this section, the representative parties have complied with the prelitigation notice provisions of ORS 13.280.

"(2) An action may be maintained as a class action if the prerequisites of subsection (1) of the section are satisfied, and in addition:

"* * * * *.

"(c) The court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. *Common questions of law or fact shall not be deemed to predominate over questions affecting only individual members if the court finds it likely that final determination of the action will require separate adjudications of the claims of numerous members of the class, unless the separate adjudications relate primarily to the calculation of damages.* The matters pertinent to the findings include:

"(A) The interest of members of the class in individually controlling the prosecution or defense of separate actions;

"(B) The extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

"(C) The desirability or undesirability of concentrating the litigation of the claims in the particular forum;

"(D) The difficulties likely to be encountered in the management of a class action, including the feasibility of giving adequate notice;

"(E) The likelihood the damages to be recovered by individual class members if judgment for the class is entered are so minimal as not to warrant the intervention of the court;

"(F) After a preliminary hearing or otherwise, the determination by the court that the probability of sustaining the claim or defense is minimal.

"* * * * *." (Emphasis added.)

The statute was enacted by the 1973 Legislative Assembly in the wake of this court's decision in *American Timber & Trading Co. v. First Nat'l Bank,* 263 Or 1, 500 P2d 1204 (1972), which held that class actions at *law* were not permissible under then existing statutory authority. As originally proposed the act was an exact duplicate of Rule 23 of the Federal Rules of Civil Procedure, which provides the authority and guidelines for class actions in the federal courts. It

emerged from committee in a significantly altered form and was passed, and the amendments form the crux of the dispute here.

In response to objections raised by opponents of the proposed procedure that insurmountable management problems would result for the court system, the Senate Judiciary Committee requested that the proponents and opponents together draft amendments in an attempt to eliminate the asserted objections. Meetings between the two groups produced the amendments which were ultimately incorporated into the bill.

Since ORS 13.220(2)(c) is central to the standards under which a class action may be maintained, it received unusual attention. The amendments added the second sentence (emphasized above) in subsection (2)(c) and also subsections (2)(c)(E) and (2)(c)(F). The source of these amendments was American College of Trial Lawyers, *Report and Recommendations of the Special Committee on Rule 23 of the Federal Rules of Civil Procedure* (1972). The language of the amendments is taken verbatim from the report's recommendations. The report is highly critical of class actions as they have been conducted under Rule 23. Speaking of the Rule 23 requirement that common questions must "predominate" over questions affecting only individual members of the class, the report stated at page 7:

"Rule 23(b)(3) requires, as a prerequisite to a class action, a court finding that the questions of law and fact common to the members of the class 'predominate' over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. This 'predominance' requirement, like many other requirements of the rule, is quite general and imprecise. Its proper application must necessarily depend upon the realization that its function is to guarantee judicial economy by reducing the number of suits that arise from a wrong common to many parties. A too liberal application of this requirement, without considering the limiting purpose of the rule, can easily transform any litiga-

tion into an unmanageable burden which will overwhelm judicial machinery and impose unfair and even coercive pressures upon the parties."

■ There can be no doubt that the purpose of the amendments was to prevent abuses perceived under Rule 23 which would put an unmanageable burden upon the court system and that the scope of the class action in Oregon was intended to be circumscribed to a greater extent than is the case under some federal courts' interpretation of Rule 23. It was found that Rule 23, which was ostensibly intended to be a time-saving consolidation device for courts, made it worthwhile to consolidate many small claims which otherwise would never have been litigated and, therefore, substantially increased the amount of litigation over that which would have occurred in the absence of the procedure.[3] Although our review of the legislative history indicates it was intended that the statute allow aggregation of small claims, it indicates also that the legislature intended to prevent cases being certified as class actions when questions concerning individual claims would be so numerous as to impose an impractical burden upon the court thereby destroying the value of consolidation.

We will first dispose of some threshold issues raised by the parties before moving to the central question in this case. The parties initially disagree over the proper scope of review of the trial court's determination that the cases should proceed as class actions. Defendants contend that this court is free to

---

[3] The stated purpose of Rule 23(b)(3) was to "achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bring about other undesirable results." Advisory Committee's Notes to Proposed Amendments to the Federal Rules of Civil Procedure, 39 FRD 69, 102-03 (1966). Conflicting views have been expressed as to whether the procedure was intended to provide a forum for numerous small claimants whose claims were too small to justify the expense of individual litigation. *Compare* Ford, *Federal Rule 23: A Device for Aiding the Small Claimant,* 10 B C Ind & Com L Rev 501, 505 (1969) *with* Landers, *Of Legalized Blackmail and Legalized Theft: Consumer Class Actions and the Substance-Procedure Dilemma,* 47 S Cal L Rev 842, 846 (1974).

make an independent determination on the question, whereas plaintiffs argue that the review is limited to inquiry into whether the trial court's ruling is supported by substantial evidence. The so-called findings of fact by the trial court were, in part, as follows:

"1. The class consists of all borrowers during the applicable six-year statute of limitations that were charged interest by the 365/360 day method of computing interest on loans that provided for interest at a certain stated rate per annum ('—— % per annum').

"* * * * *.

"8. The questions of fact common to the members of the class predominate over questions affecting only individual members. * * *.

"* * * * *.

"10. The following matters were pertinent to satisfying the prerequisites of predominance and superiority:

"a. The members of the class have expressed no interest in individually controlling the prosecution of separate action.

"b. There is no litigation concerning the controversy commenced by or against members of the class.

"c. The head offices of both defendant banks are located within the Fourth Judicial District, which is the appropriate forum for the litigation of the claims.

"d. Any difficulties likely to be encountered in the management of these cases as class actions are not serious and may be effectively handled by the trial court. In this regard the parties have expressly waived trial by jury.

"e. It is not likely that the damages to be recovered by individual class members would be so minimal as not to warrant the intervention of the court.

"f. The probability of sustaining the breach of contract and unjust enrichment claims asserted by plaintiffs is not minimal."

■ The finding that common questions of fact predominate is a conclusion of law despite its being labeled a finding of fact. If, after an examination of a scientifically selected cross-section of "commercial" borrowers, the trial court had determined that five per cent of the

borrowers knew of the banks' method of computing interest at the time they borrowed, its determination would constitute a finding of fact. However, a deduction therefrom that the common questions predominate over questions affecting only individual members of the proposed class would be a conclusion of law. We are not bound by the trial court's conclusion regarding predominance of common questions because whether the facts justify such a conclusion is a matter of law. There are no findings which speak to the predominance question other than 10d, which is also a conclusion. For an analogous situation in which there is a discussion of the scope of review of a trial judge's finding of the "voluntariness" of an admission, see the language used in *Ball v. Gladden,* 250 Or 485, 487-88, 443 P2d 621 (1968).

■  The next preliminary concern is identifying the party who has the burden of proof as to whether common questions of law or fact predominate over questions affecting only individual members. The unquestioned rule seems to be that it is the plaintiff. *Albertson's, Inc. v. Amalgamated Sugar Company,* 503 F2d 459, 463 (10th Cir 1974); *Rossin v. Southern Union Gas Company,* 472 F2d 707, 712 (10th Cir 1973); *Demarco v. Edens,* 390 F2d 836, 845 (2d Cir 1968); *Osmond v. Spence,* 327 F Supp 1349, 1360 (D Del 1971).

■■  Plaintiffs advance several contentions to the effect that there will be no necessity whatsoever for any separate adjudications as to individual class member's knowledge of the 365/360 computation practice.[4] They first assert that "per annum" means "by the year" and a "year" contains 365 days; therefore, any attempt to show that "per annum" refers to 360 days would vary the written contract and evidence thereof would be inadmissible because it would violate the parol evidence rule. The question involved, however, is the

[4]We assume, without deciding, that the named plaintiffs adequately fulfill the requirements set forth in ORS 13.220(1)(c) and (d) for representative parties.

meaning attached by the parties to the words "per annum." Ascertaining the meaning of language employed in a writing is a matter of interpretation. It is well settled that the parol evidence rule does not exclude evidence offered to aid the court in its interpretation of the language chosen by the parties. *Johnson v. Northwest Acceptance,* 259 Or 1, 13-14, 485 P2d 12 (1971); *Card v. Stirnweis,* 232 Or 123, 128-31, 374 P2d 472 (1962); 3 Corbin, Contracts § 579 (1960); IX Wigmore, Evidence § 2470 (3d ed 1940).

■ Furthermore, ORS 42.250 sets forth the principles governing the interpretation of language and expressly authorizes the introduction of evidence to show that the words employed have a "technical, local or otherwise peculiar signification." The statute states:

> "Terms construed as generally accepted; evidence of other signification. The terms of a writing are presumed to have been used in their primary and general acceptation, but evidence is admissible that they have a technical, local, or otherwise peculiar signification and were used and understood in the particular instance, in which case the agreement shall be construed accordingly."

The principles have been invoked mainly where one party is seeking to have the contract interpreted in accordance with custom or usage of trade. *May v. Chicago Ins. Co.,* 260 Or 285, 294, 490 P2d 150 (1971); *Buckler v. Hood River County,* 218 Or 293, 298, 341 P2d 555 (1959); *Schweigert v. Beneficial Life Ins. Co.,* 204 Or 294, 302, 282 P2d 621 (1955); *Dorsey v. Oregon Motor Stages,* 183 Or 494, 511-12, 194 P2d 967 (1948); *Hurst v. Lake & Co., Inc.,* 141 Or 306, 310-13, 16 P2d 627, 89 ALR 1222 (1932). The statute, however, does not require that a custom actually be proven to exist before the words can be interpreted in a "technical, local or otherwise peculiar" sense. It merely states that evidence of such a meaning is admissible and that the contract will be construed according to that meaning if it is further proved that the words were *used and understood* in that sense. Therefore, parol evidence would be admissible to show that individual borrowers

knew of the "technical" meaning employed by the banks.

Plaintiffs next point out that the statutory proscription against the likelihood of separate adjudications applies only to "the claims of numerous members of the *class*." They claim that they have defined the class to include only those borrowers who had no knowledge, and therefore reason that a final determination of the action will not require separate adjudication of the claims of members of the *class* because, if it is discovered that a borrower had knowledge of the 365/360 computation practice, that borrower will simply be excluded from the class.

The answer to this contention is that the trial court defined the class not as "all borrowers who had no knowledge," but as all borrowers who were charged interest by the 365/360 method. Even assuming the class were narrowed to include only borrowers charged interest by the 365/360 method who had no knowledge of the practice, such ingenuity should not change the result. The purpose of defining the class at the outset is to determine to whom notice must be sent and to facilitate the court's determination on the manageability of the action. ORS 13.260(1); 7 Wright & Miller, Federal Practice and Procedure 584, § 1760 (1972). While it is not necessary that every potential member be identifiable, the class must be sufficiently ascertainable for these functions to be fulfilled. As defendants point out, it would be impossible to determine the persons to whom notice must be sent if the class were defined as plaintiffs suggest, because it could not be determined at the outset the members who had no knowledge. These difficulties suggest that any class, the definition of which depends on the "state of mind" of the prospective members, would be difficult to sustain, *see Osmond v. Spence,* 327 F Supp 1349, 1359-360 (D Del 1971); *Koen v. Long,* 302 F Supp 1383, 1388 (D Mo 1969), *affirmed,* 428 F2d 876 (8th Cir 1970), *cert. denied,* 401 US 923, 91 S Ct 877, 27 L Ed 2d 827 (1971), and that the class, where possible, should be defined

upon the basis of the manner in which the defendant acted toward an ascertainable group of persons. The necessity for defining the class with absolute particularity does not arise, however, until entry of judgment, when it is necessary to describe those persons whom the judgment will bind. ORS 13.380.

■ Furthermore, defining the class as plaintiffs attempt would not avoid the policy expressed in the statute of curtailing "separate adjudications" and the resultant burden on the courts. It would still be necessary to make individual inquiry to determine whether each individual was within or without the class and such an inquiry would be as great a burden as an identical inquiry would be to determine whether something was owing to a member of the class.

This brings us to the principal question in the case. Is it "likely" that final determination will require as to "numerous" claims a separate adjudication of each claimant's knowledge of the banks' method of computing interest? If a claimant had knowledge at the time he secured his loan that the the bank was intending to compute interest thereon by the 365/360 method, or if he had information which would put him on inquiry as to the method of computation, he would not be entitled to recover, because computation by the 365/360 basis would be a term of the contract with respect to such borrowers.

The trial judge in this case labored under the misapprehension that he could postpone the question of whether, except for computation of damages, it was likely that final determination of the action would require separate adjudications of the claims of numerous members of the class, and he came to no conclusion thereon. Plaintiffs tendered a purported finding that final determination of the action would *not* require separate adjudications of claims of numerous members of the class, but the trial judge declined to so conclude, saying, "I think it is premature to make that statement." He apparently did not realize that under

ORS 13.220(2)(c) and the pleaded defense of defendants (that each member of the proposed class knew or should have known of the banks' method of computation), he had to so conclude before common questions could predominate over questions affecting only individual members. ORS 13.230.

■ ■ If plaintiffs have presented a case which is otherwise proper for a class action, it would be unreasonable to construe the statute to mean that defendants can automatically prevent such an action from proceeding by dreaming up a theoretical defense requiring individual inquiries, for which there is little basis in fact. The language of the statute, "* * * if the court finds it likely that final determination * * * will require separate adjudications of the claims of numerous members of the class," indicates that the legislature intended that the court, in ruling whether it is proper to proceed with any class action, has the obligation to decide if a defendant is pressing an issue or a defense which possesses sufficient basis and substance to justify its litigation in "numerous" instances or merely an issue or defense which is being presented for the sole purpose of avoiding a class action. If this language is so construed, it must follow that the legislature also intended that after the case has been allowed to proceed as a class action, the court has the right, after a certain number of unsuccessful attempts to establish a defense which is individual to each claimant, to rule that a defendant can no longer litigate that defense with respect to further claims.

If it were otherwise, defendants with sufficient resources could continue to assert a hypothetical but almost universally unsuccessful question or defense until the bitter end, thus "requir[ing] separate adjudications of the claims of numerous members of the class" and making the class proceeding impractical despite the essential commonality which binds the class. Permitting the case to proceed as a class action does not prohibit all individual adjudications, but only those which are so "numerous" as to make a class

action impractical by placing too great a burden upon the court.

On the other hand, if, at the time the court must first rule on whether the case may proceed as a class action, it appears probable that an issue or a defense which requires a separate adjudication as to each claim does have substance in enough instances to justify the defendants' asserting it, we believe the legislature intended that the case should not proceed as a class action. To hold that a case may proceed as a class action when there appears to be a legitimate issue or defense which will require an individual inquiry of a considerable number of the claimants would attribute to the legislature an intention either to overload the courts with an unmanageable proceeding or to deprive the defendants of valuable procedural and substantive rights by preventing them from asserting what appears to be a bona fide defense. One or the other would be the inevitable result. We attribute to the legislature neither intention in the absence of a specific indication that it so desires.[5] For cases which refuse to erode the substantial rights of parties in

---

[5]The difficulties that inhere in attempting to fit the class action into the framework of existing procedural and substantive principles have been well documented. Two recent articles which exhibit a more penetrating analysis than most are Dam, *Class Actions: Efficiency, Compensation, Deterrence, and Conflict of Interest,* 4 J Leg Studies 47 (1975), and Landers, *Of Legalized Blackmail and Legalized Theft: Consumer Class Actions and the Substance-Procedure Dilemma,* 47 S Cal L Rev 842 (1974). These commentators pinpoint the conflict in policies that is posed by the prospect of the "consumer" class action, which brings together large numbers of claimants with comparatively insubstantial claims.

It has been recognized that the consumer class action, if it is to be a successful endeavor, cannot be tried according to the traditional methods that govern other lawsuits because the trappings of a formal trial would create a bottleneck in the judicial system and defeat other policies served by the class action. Landers, *supra* at 863-64. We cannot imply from the mere enactment of a class action statute, however, that the legislature intended to abrogate settled principles of substantive and procedural law simply to make the class action manageable in instances where it presently is not. Several provisions of our statute clearly indicate to the contrary. To the extent that the class action requires novel substantive and procedural methods to obviate the necessity for, and resulting burden of, numerous individual inquiries, we must demand an explicit expression of the legislature laying out the rules of the game.

preference to permitting class action proceedings, *see In re Hotel Telephone Charges,* 500 F2d 86, 89 (9th Cir 1974), and *Weiner v. Bank of King of Prussia,* 358 F Supp 684, 697-98 (ED Penn 1973). *Also see Eisen v. Carlisle & Jacquelin,* 479 F2d 1005 (2d Cir 1973), *aff'd,* 417 US 156, 94 S Ct 2140, 40 L Ed 2d 732 (1974), in which the court said at 479 F2d 1013:

> "Thus statements about 'disgorging' sums of money for which a defendant may be liable, or the 'prophylactic' effect of making the wrongdoer suffer the pains of retribution and generally about providing a remedy for the ills of mankind, do little to solve specific legal problems. The result of this approach is almost always confusion of thought and irrational, emotional and unsound decisions. In cases involving claims of money damages all litigation presumes a desire on the part of the judicial establishment to make the wrongdoer pay for the wrongs he has committed, but to do this by applying settled or clearly stated principles of law, rather than by some process of divination. Punishment of wrongdoers is provided by law for criminal acts in statutes making it a crime punishable by fine or imprisonment to violate the antitrust laws. In certain civil suits punitive damages may be awarded; and in private antitrust cases the possible recovery of triple the loss actually suffered by a plaintiff is very properly praised as a supplementary deterrent. But none of these considerations justifies disregarding, nullifying or watering down any of the procedural safeguards established by the Constitution, or by congressional mandate, or by the Federal Rules of Civil Procedure, including amended Rule 23. It is a historical fact that procedural safeguards for the benefit of all litigants constitute some of the most important and salutary protections against oppressions, including oppressions by those whose intentions may be above reproach." (Footnote omitted.)

Applying the statute, as so interpreted, should the case proceed as a class action? While the borrowers whose loans were subject to the 365/360 method of computation of interest were classed as "commercial" borrowers, we are aware that many were not borrowing for commercial purposes. On the other hand, the

class does include commercial loans, many of which would be large sums for business purposes. The deposition of the comptroller of one of the representative plaintiffs, Hallinan Lumber Company, shows that he was familiar with the 365/360 method of computing interest. He testified as follows:

"Q. Are you aware that in some instances interest is computed on the basis of using a 360-day year, thirty-day month?

"A. Yes.

"Q. And how did you become aware of that?

"A. Oh, I suppose I had some academic knowledge of it, but I probably ran into it in experience, too.

"* * * * *.

"Q. Is it correct to say that among persons who are either accountants qualified by education or by experience that it is generally known that there are various ways of charging interest on the basis of a 360-day year, of a 365-day year, of quarterly interest, of twelfth, of interest each month and so on, is that correct?

"A. Oh, I would think so. Anybody that had more than one transaction with the bank I think has been aware of the different ways of charging interest. More than one type of transaction."

While it was not shown by the deposition that the comptroller had anything to do with securing loans for Hallinan, he was one of its two managing officials and his knowledge of the 365/360 method would be imputed to the company. A legitimate question arises whether Hallinan should have been put on notice to inquire as to the manner in which the bank was computing the interest on its loans. It is also revealed in plaintiff Jahn's deposition that Jahn had borrowed money from one of the defendants forty to fifty times, with outstanding amounts as large as $50,000. At times he was borrowing for the purpose of loaning to others and he was described as being extremely rate conscious. Although he denied knowing of the 365/360 method of computing interest, under these circumstances a legitimate question arises whether his knowledge was so limited.

■ It appears to us that a legitimate issue exists concerning the knowledge of the 365/360 method of many separate borrowers of money secured for business purposes. Such borrowers use money as a commodity. They employ accountants and money managers who are knowledgeable about the cost of money just as Hallinan Lumber Company employed its comptroller. It is, therefore, our conclusion that defendants' defense of the borrowers' knowledge is not a subterfuge but is a legitimate one of the kind which the legislature intended should be asserted.

On the record before us plaintiffs have not carried the burden of proof of the predominance of common questions. They have shown that the banks did not discuss their method of computing interest with their borrowers and that some bank officials were not aware of the 365/360 method, but it does not follow that regular borrowers for business purposes would not be on notice of it.

Plaintiffs have introduced no evidence from which we can conclude, in view of the realities of commercial borrowing, that the number of borrowers who would be legitimately subject to challenge on the issue of knowledge is less than "numerous." From the record it appears probable that many claimants' knowledge will legitimately be in issue and that separate adjudications of the claims of numerous members of the class will be required to dispose of the question of defendants' liability. In such situations the statute dictates that common questions do not predominate and that the case is not a proper one for a class action. A similar conclusion was reached by the author in Note, *Legal Aspects of the Use of Ordinary Simple Interest,* 40 U Chi L Rev 141, 154 n 71 (1972), a discussion of actions based on the 365/360 computational basis:

> "Once the distinction between consumer and commercial borrowers is made in the contractual interpretation cases, the propriety of maintaining a class action is called into question. Although there may be common questions, the presence of issues concerning frequency of

bank dealing and constructive or actual knowledge may frustrate the commonality of the purported class. Thus, unless the substantive requirements of recovery are altered for class actions, it would seem difficult to justify the maintenance of class suits here. * * *.

"* * * * *."

Many cases have refused to certify class actions wherein liability turns on resolution of certain issues which necessarily requires individual determinations with respect to members of the class and which can be legitimately pursued.[6] Recent cases illustrate the problems of such situations. In *Kline v. Coldwell Banker & Co.,* 508 F2d 226, 233 (9th Cir 1974), *cert. denied,* 421 US 963, 95 S Ct 1950, 44 L Ed 2d 449 (1975), defendants, members of the Los Angeles Realty Board, were charged with illegal adherence to a fee schedule applicable to the sale of real estate. The court would not allow the action to proceed against the defendants as a class action, saying:

"* * * Each defendant is clearly entitled to come forward and prove that he did not know of the commission schedule or that he opposed it or ignored it or, perhaps, some other yet unknown defense.

"On the question of the defendants' illegal conduct no adequate showing has been made that the questions of law or fact common to the members of the class predominate over the questions affecting individual members." 508 F2d at 233.

*In Re Hotel Telephone Charges,* 500 F2d 86, 89 (9th Cir 1974) was a fraud and conspiracy case in which the purported class of plaintiffs was composed of the renters of hotel rooms and the purported defendant class was composed of the purveyors of those rooms. In

---

[6] *E.g., Abercrombie v. Lum's, Inc.,* 345 F Supp 387 (SD Fla 1972); *Moscarelli v. Stamm,* 288 F Supp 453 (SD NY 1968); *Seligson v. Plum Tree, Inc.,* 61 FRD 343 (ED Pa 1973); *Richmond v. Railey's Appliance Center, Inc.,* 59 FRD 641 (ED Va 1973); *Graybeal v. American S & L Ass'n.,* 59 FRD 7 (D DC 1973); *Van Allen v. Circle K Corp.,* 58 FRD 562 (CD Cal 1972); *DiCostanzo v. Chrysler Corp.,* 57 FRD 495 (ED Pa 1972); *Rodriguez v. Family Publications Service, Inc.,* 57 FRD 189 (CD Cal 1972); *Caceres v. International Air Transport Ass'n.,* 46 FRD 89 (SD NY 1969), *appeal dismissed,* 422 F2d 141 (2nd Cir 1970).

deciding the case was not proper for a class action, the court ruled as to the plaintiffs' class that

"* * * [w]ithout eliminating or eroding the traditional or statutory elements of a fraud action, there is no possibility that common questions can predominate over individual ones in these claims.* * *."

As to the defendants' class, the court stated that

"* * * [i]n order substantially to establish each hotel's involvement in a conspiracy to violate the antitrust laws, each hotel's knowing participation would be a requisite element of proof. * * *."

*City of San Jose v. Superior Ct. of Santa Clara Cty,* 12 Cal3d 447, 115 Cal Rptr 797, 525 P2d 701, 709 (1974) was brought as a class action to recover for purported inverse condemnation of land caused by the operation of airplanes from an airport. The court denied an application to proceed as a class action, saying:

"However, despite this court's general support of class actions, it has not been unmindful of the accompanying dangers of injustice or of the limited scope within which these suits serve beneficial purposes. Instead, it has consistently admonished trial courts to carefully weigh respective benefits and burdens and to allow maintenance of the class action only where substantial benefits accrue both to litigants and the court. * * *."

It also said, quoting from *Gerhard v. Stephens,* 68 Cal2d 864, 912, 69 Cal Rptr 612, 442 P2d 692 (1968):

" 'Applicable precedents indicate that in observing the ascertainable class requirement they are at the same time giving recognition to the principle that a group of individuals' rights to recover, each of which is based on a separate set of facts, cannot be determined by a judgment in a class action.' * * *."

In *Johnson v. Travelers Insurance Company,* 89 Nev 467, 515 P2d 68, 72 (1973), *rehearing denied* 1974, an action was brought for a breach of an insurance contract and fraudulent misrepresentation. The court

[ 164 ]

refused to let it proceed as a class action, and said concerning the claimed breach of contract:

> "* * * Moreover, in the context of a class suit, the claim for breach of the group insurance contract would require an examination of each claimant's understanding of the contract and would inevitably deteriorate into multiple lawsuits unsuited for the purposes of Rule 23. * * *."

Plaintiffs urge us to adopt the position of the court in *Perlman v. First National Bank of Chicago,* 15 Ill App 3d 784, 305 NE2d 236 (1973), which allowed a class action for breach of contract based upon a 365/360 method of computation to proceed. The court said at 305 NE2d 247:

> "This is not to say, of course, that this record clearly shows that none of the borrowers had notice [of the 365/360 computation]. * * * If the Bank can show notice to any borrower, it may do so. What we are saying is that the number of such borrowers, at best, would appear to be small. As was said in *Harrison Sheet Steel Co. v. Lyons,* 15 Ill 2d 532, 538, 115 NE 2d 595, 598:
>
>> " '[T]he hypothetical existence of individual issues is not a sufficient reason to deny the right to bring a class action. Where it appears that the common issue is dominant and pervasive, something more than the assertion of hypothetical variations of a minor character should be required to bar the action. [Citations.] The company's opportunity to defend any individual issues that may arise will not be impaired, and it can hardly be said that it will suffer greater inconvenience by litigating those issues in a single action instead of in separate actions.' " (Brackets in first paragraph ours.)

We find the court's opinion and conclusions ill-considered and unpersuasive in several respects. The opinion contains no support, factual or otherwise, for the court's conclusion that the number of borrowers with notice "would appear to be small." The evidence in the case before us does not so prove and we refuse to base a decision on conjecture. Notice of the method of computation can be acquired by borrowers from many

sources and the opinion does not explain how this question may be explored without inquiry of each claimant. Assuming banks retain the prerogative to contest the issue, the opinion does not recognize any method by which individual inquiry can be terminated so as to prevent the action from degenerating into multiple lawsuits. In defining the class, moreover, the court failed to distinguish an ascertainable class at the outset from those who would ultimately benefit by the judgment. A judgment must exclude all those who had knowledge, but there is no indication in the opinion how they were to be isolated without individual inquiry in each case. The opinion seems to assume that in some way it would work out. Like Mr. Micawber,[7] the court seems to have hoped something would "turn up" to prevent the inquiry from being unduly burdensome. The court did make a statement which is absolutely correct: "As is pointed out by the courts and the law writers and commentators, the decisions on this subject are numerous and conflicting and each case must be decided on its own merits."

The opinion has no precedential validity. It was appealed to the Illinois Supreme Court but after two of the seven court members recused themselves, the appeal had to be dismissed because the remaining five members could not garner a constitutional majority of four necessary to decide the case. *Perlman v. First National Bank of Chicago,* 60 Ill2d 529, 331 NE2d 65 (1975). In Illinois the intermediate decision has no precedential weight.

Plaintiffs also cite *Silverstein v. Shadow Lawn Sav. & Loan Ass'n,* 51 NJ 30, 237 A2d 474 (1968), in which interest on a note secured by a mortgage was for a time figured by the 360/360 method but was changed without notice during the life of the indebtedness to the 365/360 method. There was no question about either of the party's original intention as to the method by

---

[7] An optimistic character from the novel, DAVID COPPERFIELD, by Charles Dickens.

which interest was to be figured. The court mentioned that there were probably new loans taken out (by borrowers other than plaintiffs) where the 365/360 method was used to compute interest from the inception of the loan and indicated both situations were proper for a class action. There was no discussion, however, of any defense of knowledge in those situations wherein interest was charged from inception by the 365/360 method. The court failed to permit the case to proceed as a class action because it was of the opinion that the Commissioner of Banking and Insurance had jurisdiction of the matter and would see that justice was done for others. We do not consider the case to be good authority for plaintiffs' position because (1) the case did not proceed as a class action, (2) the factual situation similar to the case here was mentioned only tangentially and was not directly in issue, and (3) there was no question raised concerning a defense which required separate adjudications.

Plaintiffs' last contention is that the use of in-court time is not required to determine the question of claimants' knowledge. First, plaintiffs suggest that the court could require from each class member a sworn statement setting forth the extent of the borrower's knowledge of the practice and its application to his particular loan. It is claimed such a procedure is authorized by ORS 13.260(2) and (3), which provide:

"(2) Prior to the final entry of a judgment against a defendant the court shall request members of the class to submit a statement in a form prescribed by the court requesting affirmative relief which may also, where appropriate, require information regarding the nature of the loss, injury, claim, *transactional relationship,* or damage. The statement shall be designed to meet the ends of justice. In determining the form of the statement, the court shall consider the nature of the acts of the defendant, the amount of knowledge a class member would have about the extent of his damages, the nature of the class, including the probable degree of sophistication of its members and the availability of relevant information from sources other than the individual class

members. The amount of damages assessed against the defendant shall not exceed the total amount of damages determined to be allowable by the court for each individual class member, assessable court costs, and an award of attorney fees, if any, as determined by the court.

"(3) Failure of a class member to file a statement required by the court will be grounds for the entry of judgment dismissing his claim without prejudice to his right to maintain an individual, but not a class, action for such claim." (Emphasis ours.)

The legislative history of this section reveals that the claim statement provided for therein was not designed to serve the purpose of establishing matters of substantive liability. The most pronounced point of disagreement between the proponents and opponents of the measure was whether it should contain an "opt-out" (i.e., one receiving notice is included in the class unless he affirmatively requests exclusion) or an "opt-in" (i.e., one receiving notice becomes member only if he affirmatively requests inclusion) procedure. The quoted provision was adopted as a compromise; the legislature accepted an "opt-out" provision for purposes of inclusion in the class at the commencement of the action, but included the claim statement requirement to enable the court to exclude from recovery any member who failed to file such a statement affirmatively prior to the entry of judgment. We believe it was contemplated that the claim statement was to be submitted for the purpose of determining damages *after* a general determination of liability, and was not intended to be used as a device for soliciting testimony required to establish any element of substantive liability.

Nevertheless, it was foreseen that in certain instances the claim statement might go out before a determination of liability, although for what purpose is unclear.[8] However, even if it was contemplated that

[8] "Mr. [Lee] Johnson [the Attorney General] clarified that the second notice [claim statement] did not necessarily mean it would have to go out at

the statements could be used for the purpose of delving into matters touching upon individual liability, there is no indication that the legislature intended to give them conclusive effect and, thus, to deprive defendants of their substantial rights to cross-examine the claimants under oath.

██  Secondly, plaintiffs propose that the matter could be handled by reference to a special master, thereby eliminating the need for court time. Several federal courts have adopted such a procedure. *See, e.g., Foster v. City of Detroit,* 405 F2d 138, 147 (6th Cir 1968); *Brennan v. Mid Western United Life Ins. Co.,* 286 F Supp 702, 729 (ND Ind 1968), *affirmed,* 417 F2d 147 (7th Cir 1969), *cert. denied,* 397 US 989, 90 S Ct 1122, 25 L Ed 2d 397 (1970). A separate adjudication remains such regardless of whether conducted before the court or a special master. Assuming that the limitation on separate adjudications is intended to minimize the burden on the judicial system, nothing is achieved by shifting the onus onto a special master.

The decision of the trial court permitting the cases to proceed as a class action is reversed.

any given time, however, it was contemplated that it would go after the determination of liability, but could go out earlier if the court determined it desirable. * * *." Minutes of Hearings on SB 163 Before House Comm. on the Judiciary, 1973 Legislative Session (June 13, 1973).