# DERENCO, INC., *Respondent/Cross-Appellant,*
*v.*
# BENJ. FRANKLIN FEDERAL SAVINGS AND LOAN ASSOCIATION,
*Appellant/Cross-Respondent.*
## (No. 404-741, SC 24467)

577 P2d 477

[ 534-a ]

James H. Clarke, of Dezendorf, Spears, Lubersky & Campbell, Portland, argued the cause for appellant/cross-respondent. With him on the briefs were C. E. Wheelock, of Wheelock, Niehaus, Baines, Murphy & Oglivy, Portland, and Wayne Hilliard and Vawter Parker, Portland.

James Kirkham Johns, Portland, argued the cause for respondent/cross-appellant. With him on the brief

were Henry A. Carey, Michael A. Corn, Edward Fitzgibbon, and James Morrell, Portland.

John R. Aust, Jr., of Hardy, Buttler, McEwen, Weiss & Newman, Portland, filed a brief for amicus curiae Oregon Savings and Loan League.

Before Denecke, Chief Justice, and Holman, Howell, Lent, and Linde, Justices.

HOLMAN, J.

## HOLMAN, J.

This is an interlocutory appeal accepted by this court under ORS 13.400. Plaintiff, Derenco, Inc., filed suit upon behalf of itself and others for an accounting of profits. The suit was certified by the trial court as a class action. The court found for plaintiff and ordered an accounting. Both sides seek review to secure a final determination of controlling issues before entertaining statements of claim from class members under ORS 13.260(2) and proceeding to judgment under ORS 13.380.

Defendant is a federally chartered savings and loan association engaged in making loans on single family dwellings. This suit, brought upon behalf of borrowers from defendant, claimed entitlement to the income derived from defendant's investment of funds deposited with it by borrowers for the payment of taxes and insurance premiums on their dwellings. With each month's payment of interest and principal on his loan, each borrower also deposited one-twelfth of the amount estimated to be required annually for taxes and insurance premiums. At the end of the period of accumulation, defendant used the deposits to pay the taxes and insurance premiums. During the period of accumulation defendant used the funds as its own, and it is reimbursement for this use which is in question here.

Plaintiff instituted this suit in July of 1974. We are concerned with the period commencing six years prior to that time. Not all of the security instruments used by defendant during the relevant period had the same provisions for prepayment of taxes and insurance premiums. The "conventional" mortgage form, used by defendant until February 1, 1972, contained the following language:

"* * * The monies so deposited by Mortgagors *shall be credited to a reserve account,* and Mortgagee is herewith *authorized to charge against said account as a withdrawal sufficient amounts to pay accruing taxes and*

*insurance premiums* when due to the full extent of said account, if necessary. If there should be insufficient sums in said account to pay said taxes and insurance premiums when due, Mortgagor shall, upon demand, pay to Mortgagee an amount necessary to satisfy said deficiency. * * *."(Emphasis added.)

On February 1, 1972, there were inserted into the conventional mortgage form set forth above the words emphasized in the following excerpt:

"* * * The monies so deposited by Mortgagors shall be credited to a *non-interest bearing* reserve account, and Mortgagee is herewith authorized * * *."

The trial judge required an accounting by defendant on the reserve accounts established through both of these forms on the theory that defendant was the borrowers' agent.[1]

In addition, a third form was required by the Federal Housing Administration (FHA) on loans which it insured, which form contained the following language:

"* * * such sums to be held by the Beneficiary *in trust to pay* said ground rents, *premiums, taxes* and special assessments, before the same become delinquent * * *." (Emphasis added.)

The trial judge required an accounting on reserve accounts established through this form on the theory that the instrument created a trust relationship.[2]

On the question of the appropriate remedy, the trial judge held that because the exact amount of earnings enjoyed by defendant for its own purposes as a result of its use of the reserve accounts could not be ascertained, and because defendant had incurred some

---

[1] Restatement (Second) of Agency § 388 states the rule requiring an agent to account to his principal for any profits derived from activities conducted for the principal's benefit.

[2] Defendant used a fourth security instrument on mortgages made by it and sold to the Federal Home Loan Mortgage Corporation. The trial court determined that this instrument created a mere debtor-creditor relationship, and that defendant owed no accounting duty to borrowers under it. The correctness of this ruling is not challenged on appeal.

expense in administering the account and in investing the funds, it was equitable for defendant to pay interest on the reserve account funds at the same rate as that which defendant paid to depositors on ordinary demand savings accounts during the same period of time.

We will first consider an issue of consequence which may obviate all other problems, depending upon how it is decided. Defendant contends that the relevant federal law in this area has a preemptive effect and that the state is therefore precluded from regulating defendant's activities via enforcement of the common law. This contention is based upon the following language from Article VI of the United States Constitution, which language is known as the supremacy clause:

> "* * * * *.

> "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; * * * shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.
>
> "* * * * *."

The federal scheme in the present case is designed "to provide local mutual thrift institutions in which people may invest their funds * * * to provide for the financing of homes." 12 USC § 1464. Federal savings and loan associations are by federal statute subject to regulation by the Federal Home Loan Bank Board (the Board).[3] The primary enabling statute provides that the Board

> "* * * is authorized, under such rules and regulations as it may prescribe, to provide for the organization, incorporation, examination, operation, and regulation of associations to be known as 'Federal Savings and Loan Associations', and to issue charters therefor * * *." 12 USC § 1464(a).

_____
[3] _See_ Home Owners' Loan Act of 1933, 12 USC §§ 1461 _et seq._

Pursuant to this grant of authority, the Board has promulgated detailed regulations concerning many aspects of a federal association's operations.[4] Since 1938 it has authorized tax and insurance premium reserve accounts. As amended in 1958, the regulation which applied until after the filing of this case, 12 CFR § 545.6-11, provided that each loan contract of a federal association

> "* * * *shall provide* specifically *for* full *protection with respect to insurance, taxes,* assessments, other governmental levies, maintenance, and repairs, and it may provide for an assignment of rents and for such other protection *as may be* lawful or *appropriate* * * *. A Federal association may require* that the equivalent of *one-twelfth of the estimated annual taxes,* assessments, *insurance premiums,* and other charges on real estate security, or any of them, *be paid in advance* to such association *in addition to interest and principal payments* on its loans, to enable the association to pay such charges as they become due from the funds so received * * *." (Emphasis added.)

The regulations also *required* that such accounts be maintained for loans of more than 80 per cent of the value of the security. 12 CFR § 545.6-11(a) (4) (iii). The question of the authority of a federal association to use funds deposited in reserve accounts as its own, or of its duty to compensate borrowers for such use, was not addressed under these earlier versions of the regulation. After the commencement of this suit, however, in an amendment to section 545.6-11 (12 CFR § 545.6-11(c)), effective June 16, 1975, the Board required federal associations to pay interest[5] (not earnings) on such accounts if the parties provide for it in their agreement or, in the case of loans made after the regulation's effective date, if a state statute imposes a

---

[4] *See* 12 CFR §§ 545.1 *et seq.*

[5] As we explain below, we construe the regulation's use of the term "interest" to include any payments a federal association may be required to make to borrowers for use of reserve account monies.

similar duty on locally authorized associations.[6] The amendment then provides:

"Except as provided by contract, a Federal association shall have no obligation to pay interest on escrow accounts apart from the duties imposed by this paragraph."

The regulations at no time say anything specifically about the right of an association to use the funds deposited.

Defendant's specific contention concerning preemption is stated thus:

"Defendant contends that it cannot be required to pay interest or earnings on reserve accounts, because the terms of the federal regulations preclude that obligation, and second, federal regulation has occupied the field of reserve accounts, so as to preclude any state regulation of that subject matter or the imposition of any duty to pay interest or earnings under state law. Defendant contends that this is so as a matter of law, whether or not the federal regulation precisely responds to plaintiff's claim."

■ If the contention that the regulations preclude payment of interest or earnings is based on that part of the 1975 amendment to the regulation quoted above, we reject it insofar as it relates to the period before the effective date of the amendment. There is no indication of any intention that the regulation be retroactive, and we do not so construe it.[7]

Finding no express preclusion of state regulation in this area, we turn to a more detailed analysis of the

_____

[6] Oregon adopted a statute requiring the payment of interest on deposits on loans entered into subsequent to September 1, 1975, at the highest rate currently authorized to be paid by banks on their open passbook accounts, minus three-quarters of one per cent, but, in any event, no less than four per cent. ORS 86.245 (1975 Oregon Laws ch 337, § 8).

[7] Statutes or regulations which say nothing about retroactive application are not applied retroactively if such a construction will impair existing rights, create new obligations or impose additional duties with respect to past transactions. *Joseph v. Lowery,* 261 Or 545, 547, 495 P2d 273 (1972); *Kempf v. Carpenters & Joiners Union,* 229 Or 337, 341-43, 367 P2d 436 (1961).

[ 539 ]

bases upon which state regulation may be preempted. Unfortunately, the United States Surpreme Court has not adopted a uniform approach to preemption issues. Many of the cases are inconsistent with each other, but it is extremely rare that a case is overruled. The result is a variety of methods of dealing with preemption problems and some guesswork as to which analysis will be employed in a given case. One point that may "excuse" the apparent confusion and inconsistency in the cases is that the particular circumstances of each case are of compelling importance in reaching a decision. Since the language and interpretation of both the state and federal laws, and their interaction and possible or actual conflict, provide the real answers to specific questions, it would not be expected that any one test would be satisfactory for all cases. The Court has noted from time to time that by virtue of the nature of the problem no one test could work in all cases. *See, e.g., Hines v. Davidowitz,* 312 US 52, 67, 61 S Ct 399, 85 L Ed 581 (1941).

■ ■ In addition to the occasions in which the federal law expressly precludes state action, it would seem that there are three situations in which state law is preempted. The first is when the state law is in direct conflict with the federal law and therefore must fall. The "conflict" ground of preemption appears to be restricted to cases in which the federal and state laws require a defined group of persons to act in contrary ways. Hirsch, *Toward a New View of Federal Preemption,* 1972 U Ill Law Forum 515, 526-27. In this case there is no such conflict between the federal statutes and regulations and the application of Oregon common law.

The second situation in which state law is struck down is when it interferes with the operation of the federal enactment or impairs attainment of federal goals. This test appears to be the favored one in recent times. The original statement of the interference rule comes from *Hines v. Davidowitz, supra* at 67, in which the Court's task was stated to be "to determine

whether, under the circumstances of [the] particular case, [the state's] law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

■ The imposition of an accounting as sought by plaintiff here *could* produce an obstacle to attainment of federal goals, but a considerable amount of speculation is required to entertain the possibility seriously. Requiring defendant to account for profits on the deposits in question could conceivably impair its economic health and thereby prevent it from carrying out its statutory function. However, we do not believe that preemption occurs simply because under some imaginable set of economic facts the application of state law could impede the efficient execution of a federal statutory purpose.

■ The interference basis for preemption in this case is further weakened by the regulation subsequently promulgated by the Board under which a federal association is required to pay interest on reserve accounts when state law imposes the same duty on state chartered associations, or when the association has entered into an agreement with the borrower to pay interest. 12 CFR § 545.6-11. This action by the Board amounts to an administrative determination that imposition of a duty to pay interest does not in all situations result in the creation of an obstacle to attainment of the federal goals. Since the economic impact of the amended regulation could be similar to that resulting from the trial court's decree, it would be inappropriate to conclude that the imposition of the duty to account creates an obstacle to attainment of federal goals justifying a holding that state law is preempted.

■ The third basis for preemption is the so-called "occupation of the field" doctrine. If it is determined that Congress has occupied a field, the states are precluded from enacting any laws covering the subject matter, even if they are consistent with the federal

law or are complementary to it. The application of this basis for preemption is difficult to predict because every act of Congress occupies some field. The boundaries of the field must be known before a determination can be made, and that usually requires an exercise in construction and depends upon how narrowly or broadly the court desires to construe the statues in question. This technique appears to be losing ground as a method for striking down state law, although it was employed to preclude application of a municipal noise ordinance forbidding landings and take-offs during certain hours in *Burbank v. Lockheed Air Terminal,* 411 US 624, 93 S Ct 1854, 36 L Ed 2d 547 (1973). Occupation analysis is usually expressed as a search for congressional intent to preclude the states from enacting legislation covering the same subject matter dealt with in federal statutes. The intent purportedly sought is most often a fiction, but it is not always unreasonable to infer from a given scheme of federal regulation that there is "no room" for the states to act.

Several factors have been looked to in determining that Congress has occupied a field. In some cases it will be significant that the subject matter is of particularly important federal interest. Thus, in *Hines v. Davidowitz, supra* (state law requiring registration of aliens), and *Pennsylvania v. Nelson,* 350 US 497, 76 S Ct 477, 100 L Ed 640 (1956) (state sedition act), it was significant that the subject matter impinged on foreign relations.[8]

---

[8] Recent cases have allowed the states more latitude in areas involving some matters which are of considerable federal interest where the Court is convinced that the state action has its effect outside the "field" Congress is actually regulating. *E.g., De Canas v. Bica,* 424 US 351, 96 S Ct 933, 47 L Ed 2d 43 (1976) (enactment of Immigration and Naturalization Act does not preempt state law forbidding employment of illegal aliens); *Goldstein v. California,* 412 US 546, 93 S Ct 2303, 37 L Ed 2d 163 (1973) (Copyright Clause and Copyright Act do not preclude state record piracy statute); *Merrill Lynch, Pierce, Fenner & Smith v. Ware,* 414 US 117, 139, 94 S Ct 383, 38 L Ed 2d 348 (1973) (New York Stock Exchange Rule adopted pursuant to Securities Act does not preempt state law providing that employee wage disputes may not be restricted to arbitration when applied to Exchange member).

Congressional intent to occupy a field also is sometimes found when the federal regulatory scheme is pervasive or comprehensive in its coverage of the subject matter. When Congress has undertaken thorough, and therefore seemingly complete, regulation in an area, the inference is that the states are deprived of all power to take action on the same subject. *Rice v. Santa Fe Elevator Corp.,* 331 US 218, 230, 67 S Ct 1146, 91 L Ed 1447 (1947). In recent cases, however, the Court has limited application of this approach to preemption by narrowly defining the field regulated by Congress. Detailed regulation of a wide range of problems will not serve to preempt state law if the Court determines that the state law has its effect in an area outside the thrust of the federal enactment. For example, in *De Canas v. Bica,* 424 US 351, 96 S Ct 933, 47 L Ed 2d 43 (1976), California was allowed to forbid the hiring of illegal aliens even though the Immigration and Naturalization Act had dealt quite specifically with a wide range of issues involving entry into the country and the status of illegal entrants. Employment relationships were seen as being outside the field occupied by Congress, and the states were thus free to act. The statutes enacted by Congress were detailed but this did not impress the Court since it was to be expected that legislation dealing with such a complex subject matter would involve considerable detail.[9]

The cases dealing with preemption problems which concern this particular subject or similar subjects point in different directions and are not very helpful. We will first deal with the cases from which it can be most easily argued that defendant's position is correct. The cases rely, in the main, on the notion that federal law has occupied the field pertaining to federal savings and loan associations. In *Meyers v. Beverly Hills*

---

[9]The Court had previously expressed a reluctance to find preemption on the basis of the detail of a statutory scheme in *New York State Dept. of Social Services v. Dublino,* 413 US 405, 93 S Ct 2507, 37 L Ed 2d 688 (1973).

*Federal Savings & Loan Ass'n.,* 499 F2d 1145 (9th Cir 1974), a class action by borrowers was filed which claimed the provision used by defendants in their loan agreements concerning prepayment of the loan was void under California law. The court held the subject was preempted by a Board regulation on the specific matter, a result that is inescapably correct. However, in doing so it used much general language, including a statement quoted from the opinion in *People v. Coast Federal Sav. & Loan Ass'n.,* 98 F Supp 311, 316 (SD Cal 1951), to the effect that pursuant to valid statutory authority the Board had promulgated comprehensive regulations concerning all aspects of every savings and loan association "from its cradle to its corporate grave."

In *People v. Coast Federal Sav. & Loan Ass'n.,* just mentioned, an injunction was sought, together with statutory penalties, against a federal savings and loan association because it was claimed it had transacted business as a savings bank in violation of a California statute. The actual holding of the case was that the Board, and not the court, has primary jurisdiction over matters relating to the operation of federal associations; but the court went on to express its belief that "* * * Congress has preempted the field," and that state law could, therefore, not be applied. 98 F Supp at 318.

In *Rettig v. Arlington Hgts. Fed. Sav. & Loan Ass'n.,* 405 F Supp 819 (ND Ill 1975), the plaintiff contended that the directors and the association had diverted corporate opportunities by causing individual borrowers to be referred to director controlled insurance agencies to procure the necessary insurance in connection with loans. In holding state law preempted, the court noted that "the Board has consistently taken the position that under governing provisions of HOLA, savings and loan associations are not permitted to engage directly in the insurance business * * *," 405 F Supp at 824, and that although they were authorized to invest in service corporations organized under state

law to facilitate services of the association, they could do so only in connection with activities pre-approved by the Board. There had, apparently, been no such approval. The Board had also adopted a regulation concerning conflict of interest and corporate opportunity. These specific regulatory actions obviously governed over state law; however, the court gratuitously used general preemption language, including the "cradle to its corporate grave" quote, which only proves it pays to turn a phrase.

Defendant's strongest case is *Kaski v. First Fed. S & L Ass'n of Madison,* 72 Wis 2d 132, 240 NW2d 367 (1976). The plaintiff brought an action to declare that an interest rate escape clause contained in its mortgage note was invalid because it was unconscionable, vague, and indefinite. The court said, 240 NW2d at 372-73:

> "Applying these general principles of law to the case at hand, it is apparent that Congress has substantially occupied the field in regard to the regulation of federal savings and loan associations, particularly in the area of the regulation of lending practices. This scheme of federal regulation is pervasive. Moreover, it has long been held that the establishment of a federal system of banking or of lending is of such importance in our national life that, for the most part, state laws should not be allowed to interfere. *McCulloch v. Maryland* (1819), 17 U.S. (4 Wheaton) 316, 4 L.Ed.579. It is apparent that the Congress considered that the regulation of lending procedures of federal institutions was one that required national and uniform regulation.

> "In federal cases arising in the state of Wisconsin, the courts have held that Congress intended to occupy the field of control of federally chartered savings and loan associations and has delegated the regulatory authority to the Federal Home Loan Bank Board. * * *.
> "* * * * *.

> "The general tenor of these cases is that any regulatory power which a state attempts to exercise that potentially conflicts with federal legislation or its purpose, or that results in lack of uniformity in the internal

[ 545 ]

management or lending practices of federal savings and loan associations, is subordinate to federal law. The regulation of loan practices directly affects the internal management and operations of federal associations and therefore requires uniform federal control. The present litigation ought, therefore, be resolved as a matter of federal law."

The court then proceeded to remand the case to the lower court to be disposed of by what it considered to be "federal law."

The principal cases upon which plaintiff depends include *Federal National Mortgage Assoc. v. Lefkowitz,* 390 F Supp 1364 (SD NY 1975). This was an action to declare unconstitutional as applied to the plaintiff a New York statute which required lending institutions to pay interest of at least 2 per cent on accounts of the same nature as those in question in the present case. The plaintiff was a national mortgage association established pursuant to 12 USC § 1716 *et seq.* for the purpose of creating a secondary market for home mortgages. Generally, it bought mortgages from investors and mortgage companies which originated the mortgages. The Secretary of Housing and Urban Development was given general regulatory authority over institutions such as plaintiff. In addition, Congress had exempted the plaintiff from having to qualify to do business in any state and had given it state taxation immunity.[10]

The court stated that payment of interest on the accounts did not impose a burden upon the performance of the plaintiff's functions and that because Congress had not regulated upon this particular subject, the state was free to regulate it. The language is in conformance with Derenco's contention; however, the difficulty with the case from its standpoint is that the favorable language seems to be unnecessary to the holding. Federal National was not a party to the original mortgage but only purchased it subject to

---

[10] *See* 12 USC §§ 1723a(a), 1723a(c) (1).

those obligations created by the original parties. The original parties, of course, were subject to and controlled by state law and, upon purchase of the mortgage, the plaintiff only succeeded to those rights which the mortgagee had under that law. Having only succeeded to the rights of another who was unquestionably subject to state regulations, Federal National was in no position to claim the law was unconstitutional as applied to it.

In *Johnson v. First Fed. Sav. & Loan Ass'n. of Detroit,* 418 F Supp 1106 (ED Mich 1976), the plaintiff brought a class action of the same nature as in the instant case. In determining whether the case should be remanded to state court, the court considered defendant's argument that the defense of federal preemption raised a federal question which gave it jurisdiction.[11] Referring to the recent amendments to the regulations, the court expressed the following opinion in dicta. 418 F Supp at 1109:

> "The court doubts that there is federal preemption in this case. The regulation principally relied upon by defendant (12 CFR 545.6-11) demonstrates implicitly that preemption was not intended. That regulation incorporates by reference state law in the several jurisdictions, and allows disparate results where bargained for in express contracts. Since a desire for uniformity is a major reason that Congress uses to decide that federal law preempts a given field, the specific rejection of uniformity by it indicates that federal preemption was not intended."

In *Pearson v. First Federal Savings and Loan Ass'n.,* 149 So2d 891 (Fla App 1963), the plaintiffs were depositors who complained in state court of mismanagement on the part of the directors. Among other questions were the legality of proxies given by the depositors to the directors and the management's

---

[11]The court concluded that "preemption is a matter of defense to a state law claim," and does not warrant removal of a case from state court. *Johnson v. First Fed. Sav. & Loan Ass'n. of Detroit,* 418 F Supp 1106, 1109, (ED Mich 1976), *quoting Washington v. American League of Professional Baseball Clubs,* 460 F2d 654 (9th Cir 1972). See 28 USC § 1441(c).

methods in securing them. A request was made that the proxies be declared invalid. Although the right of the members to vote by proxy was conferred by charter, neither the statute nor the Board's rules had any provisions with which to determine the validity of the proxies. The court held that a determination of the validity of the proxies by a state court would not frustrate the purpose for which the association was created nor impair its efficiency.

In *Durnin v. Allentown Federal Savings and Loan Ass'n.,* 218 F Supp 716 (ED Pa 1963), the plaintiff, a depositor in a federal savings and loan association, made a request of the association for a list of all members of the association; the request was denied, and the plaintiff brought a proceeding to secure relief. There were no federal regulations on the subject. In the face of a preemption argument that silence on the subject indicated an intent to deny access to the list of members, the court held that more than silence of the regulations would be required to overcome the general "common law" right of a member of a corporation to inspect and copy a member's list, and that public policy required such an inspection in the absence of expressed statutory or equivalent denial.

■ We conclude that the type of state regulation sought to be imposed here is not preempted on any of the bases discussed. The present tendency of the United States Supreme Court appears to be to accommodate, if possible, both federal and state law. There is no substantial conflict or interference between the trial court's holding in the case and the regulation of federal associations by Congress and the Board. Neither do we believe the field has been entirely occupied. Congress is always capable of saying if it intends to occupy the field exclusively and so are federal regulators.

■ It is our belief that federal law should not and will not be held to occupy the field to the exclusion of state common law in the absence of more compelling

reasons than those which exist here. Federally chartered institutions doing business within the state should comply with the business usages and ethics required of others engaged in similar businesses within the state unless such usages and ethics actually conflict or interfere with federal purposes or unless Congress or the federal regulatory body unmistakably indicates otherwise. Though the most recent regulation is not applicable retroactively, we consider a fair inference therefrom to be that the Board must necessarily have come to the conclusion that the kind of relief granted by the trial court here does not unduly interfere with federal aims. We agree.

▮ Defendant also makes the contention that a decision in this case must be based on "federal law," that state rules for interpretation of the parties' relationship are not applicable, and it cites authority favorable to its position that it has no responsibility arising from the use of the funds in the deposit. It is our conclusion that this is not a field which requires the exclusive use of federal law. In some fields, such as federal labor law, uniformity of decision is so necessary to the carrying out of congressional intent that the United States Supreme Court has decided that federal decisional law is exclusively applicable in order that the labor law be formulated "according to the precepts of federal labor policy." *Teamsters Union v. Lucas Flour Co.,* 369 US 95, 103, 82 S Ct 571, 7 L Ed 2d 593, 599 (1962). It has never laid down such a rule applicable to federal savings and loan associations and, although we find such expressions in some inferior federal court cases, we believe, for the reasons expressed in deciding the preemption issue, that there is no necessity for exclusive use of federal decisional law in interpreting the parties' relationship in this case and their resultant obligations, if any.

The next issue of major consequence is whether plaintiff has proved any obligation on behalf of defendant to pay to borrowers the funds generated by

defendant's use during the period of accumlation of the money deposited with it for the payment of taxes and insurance premiums. If such an obligation exists, it arises out of the relationships between borrowers and defendant rather than the contracts alone, because the contracts, which are found in the security instruments used by defendant, are silent on the subject and, in fact, do not even provide for defendant's use of the money, other than permitting it to pay the taxes and insurance premiums when they are due. Only the "conventional" mortgage form used since 1972 says anything concerning any kind of payment to borrowers and it says only that defendant *is not* obligated to pay *interest* as distinguished from the proceeds from its use of the money. As a result, all of the written contracts are ambiguous, insofar as the question here is concerned, and the situation must be assessed in view of the total circumstances surrounding the relationship of the parties, of which the contracts are only one part.

We will commence with consideration of the conventional mortgage form used by defendant prior to the change of that form in 1972. Defendant contends that the mortgage is a contract delineating the rights of the parties, that it has no provision for any payment by it to borrowers, and that any such payment is therefore foreclosed by the lack of any such provision requiring it. Any rights of the parties, whether consensual in nature or otherwise, necessarily depend, at least in part, on how we construe the parties' obligation under the contract. The mortgage provides that the payments for taxes and insurance premiums "shall be credited to a reserve account, and mortgagee is herewith authorized to charge against said account * * *." It then specifies what defendant is authorized to do with the money; it makes no mention, however, of the money's being used for defendant's own purposes other than to protect its security. We also infer from the evidence that it was not usual for defendant

[ 550 ]

to tell borrowers at the time of the loan of its intended use of the funds during their period of accumulation.

An important aspect in the consideration of the surrounding circumstances is the purpose of the deposits. There is no substantial controversy in this regard. The deposits were for the purpose of protecting the security of defendant's mortgages from unpaid taxes and uncompensated loss of the improvements by fire or other disaster. In the absence of other evidence, it would be reasonable for us to assume that defendant should have whatever interest in the money that was necessary to accomplish the purpose of the deposits. Beneficial interest in the money by defendant during its period of accumulation was unnecessary to the security of its mortgages. However, there is no doubt that defendant had the unexpressed intention to have such interest. Insofar as the value of its use of the money might exceed the expense of administering the accounts and making payments, defendant would receive a gratuitous windfall. It results in the borrowers' paying defendant for the use of the money they have secured from it, while defendant is paying nothing for the use of the money it has obtained from borrowers for a purpose which can be fully accomplished without defendant's beneficial use thereof. At the time of the making of the contract there would have been no reason for the borrowers to assume, in the absence of their being otherwise informed, that defendant would have any interest other than that which was necessary to accomplish the purpose of the deposits.

Defendant contends that part of the *quid pro quo* for the use of the money is the benefit which borrowers derived from having their homes protected by the budgeted monthly amount against non-payment of taxes and risk of casualty loss. This is only argument from hindsight to justify what has occurred. The real reason for the deposits, at least in the case of all taxes and some insurance premiums, is that defendant

required such deposits for its own protection rather than out of any sense of concern for the borrowers.[12]

There is another aspect of the matter which we consider to be important. We infer from the evidence that loans were required to be transacted on defendant's security forms. Ambiguous contracts are usually construed against the party who drafts them. Silence on the subject of a right which the drafter later contends he has is usually fatal to his contention unless such right is one which necessarily results from the other terms of the contract. In the present situation a beneficial interest in defendant in the money does not necessarily result from the written terms of the contract. Construction against the drafter of the contract is particularly appropriate in a situation like the present where the contract is one of adhesion with the borrowers' having no opportunity to negotiate its terms. We therefore reject the arguments that the borrowers were equally responsible for the omission of any provisions concerning the use of the money and that, since the parties contracted for reserve accounts without providing for payment of interest or earnings, the agreement is conclusive of defendant's right to use the funds without reimbursement.[13] The borrowers were in no position to question or negotiate the terms of the contract.

Defendant contends, however, that there is reason in the present situation for the borrowers to know of defendant's proposed use of the money due to the general knowledge which people possess of banks and similar institutions making their profits by loaning funds deposited with them. Defendant depends on the

---

[12]The Board's regulations required the deposits if loans were close to the actual value of the property.

[13]For cases agreeing with defendant's contention but which fail to consider who drew the contract or to examine its adhesion nature, see *Cale v. American National Bank,* 37 Ohio Misc 56, 66 Ohio Op 2d 122, 124 (CP Cuyahoga Cty 1973); *Brooks v. Valley National Bank,* 113 Ariz 169, 548 P2d 1166, 1171 (1976).

following language from 1 Restatement (Second) of Trusts § 12, comment *l.*, at 41-42:

> "If money is deposited in a bank for a special purpose, the bank is not a trustee or bailee of the money unless it is the clear understanding of the parties that the money deposited is not to be used by the bank for its own purposes.
>
> "\* \* \* \* \*.
>
> "Where the deposit is in escrow, that is where the money is to be paid to a third person on the happening of a designated event and in the meantime the depositor has no right to withdraw the money, it depends upon the manifestation of the intention of the parties whether the bank may use as its own the money deposited or whether the money shall be held in trust. Such a deposit ordinarily indicates an intention that the bank may use the money as its own, the bank undertaking to pay to the third person the amount of the deposit on the happening of the designated event."

V Scott on Trusts § 524 at 3669 (3d ed 1967) is not so sure of the result:

> "\* \* \* one circumstance of great importance is custom in the business of banking. It has sometimes been held that a custom is so well established and well known that the courts will take judicial notice of it. In many cases, however, the courts have required evidence of custom; and the amount of evidence and the character of the evidence offered have so varied that it is not unnatural perhaps that the decisions have shown a wide divergence in determining the character of the relation created. Moreover a custom may be one not known to the person whose rights are involved, and one not so well established and generally known that he is chargeable with notice of it; in which case, in spite of the existence of the custom, he will not be bound by it. Banking customs, however, are becoming better established and better known, and will doubtless play an increasing part in determining the results reached by the courts." (Footnote omitted.)

There is no evidence in this case of a uniform custom among lenders as to how, and for whose

[ 553 ]

benefit, any earnings on funds representing prepayments are handled. To the contrary, there is evidence that some savings and loan associations do give borrowers, while the money is being accumulated, the benefit of any earnings from use of the deposits made for taxes and insurance premiums. This is accomplished by use of the "capitalization" method of administering reserve accounts. Under it, whenever a borrower makes a payment, the entire amount, including that portion attributable to taxes and insurance premiums, is credited to interest and debt. When the time comes for payment of the taxes and insurance premiums, the account is charged with these amounts. In this manner the purpose of the deposit, security for the lender, is accomplished and the borrower is given the benefit of the use of the funds.[14]

In addition, the concepts that persons who borrow money on their homes have knowledge of banking practices and that those who make reserve deposits are even aware of the beneficial use of such deposits are highly suspect. It is questionable whether homeowners would look at funds deposited with a savings and loan association or a bank for the payment of taxes and insurance premiums on premises put up as security for a loan in the same manner as they would look at money deposited in such institutions on which they were being paid interest. When a depositor is paid interest, it would seem to us probable that he realizes that the lending institution must have the use of the money in order to pay him the interest.[15] However, when he is not paid interest nor told that deposited funds will be put to the institution's use, but instead is told that they will be put into a reserve account, we believe it is doubtful that he would expect the money to be used for the benefit of such institution.

---

[14] It also obviates the expense of maintaining two or more accounts for each borrower.

[15] "Where the bank undertakes to pay interest on the deposit, it is clearly the intention of the parties that the bank should have the use of the money, * * *." V Scott on Trusts § 530 at 3685 (3d ed 1967).

[ 554 ]

It would seem to us reasonable for a depositor to assume, in the usual situation in which money is deposited in a checking account or, at the request of the depositor, deposited for a special purpose, that the funds will be used by the bank in order that it be paid for its service. However, the deposits in question here were not established for the convenience of the depositor, as is the usual case, but were established at the insistence of defendant for its protection and for a purpose which had nothing to do with defendant's having a beneficial interest in the money.

From the testimony of defendant's officer in charge of loans and from the small value of the beneficial use of the deposits for each loan, we infer that the instances in which the beneficial use of the money even occurred to borrowers were isolated and infrequent.[16] Defendant's officer testified that the instances in which any information was requested by borrowers concerning income from their deposits were limited to three or four oral inquiries a year and to two or three written inquiries every five years. These inquiries were apparently limited to whether interest was paid, and the responses thereto were that interest was not paid. Considering that the borrowers who are affected by this opinion are in the many thousands, it would appear that the number of people who were knowledgeable enough to ask anything about the deposits at all is inconsequential. It could be argued that the balance did not inquire because they knew of the custom of loaning institutions making use of such deposits and they assented to it. However, because of the lack of evidence establishing such a custom and because of the other evidence, we believe the inference of the borrowers' lack of awareness of the subject of the beneficial use of the deposits is a fair one.[17]

[16]Defendant accumulated deposits for taxes payable on Oregon real estate of approximately $18,000,000 annually. In addition, it made loans on property in southern Washington.

[17]It is both interesting and revealing to see how defendant's right to use the funds was treated for internal accounting purposes by defendant.

For the reasons given, despite the following language from V Scott on Trusts § 530 at 3684-685 (3d ed 1967), it is our conclusion that justice and fair dealing require a recovery by borrowers:

> "The question in each case is a question of the intention of the depositor and the bank. *Usually the intention is not expressed in words and frequently the matter is not even in the minds of the parties. The courts in such cases have to struggle with the question what the parties would have thought if they had considered the matter.* In most cases a depositor surely would not expect a bank to segregate the money deposited nor would the bank expect to do so. It is believed that the cases which hold that a debt is intended show a more realistic attitude on the part of the courts, and that in many of the cases at least in which the courts have said that a trust was intended they have gone counter to the real intention of the parties. * * *. The mere fact that a deposit is made for a special purpose is not a sufficient reason, unless there is an understanding that the money deposited should not be used as a part of the general assets of the bank.

> "It would seem that the presumption is that when a bank receives money it is intended that the bank should use the money; and the burden is on the depositor to show that the understanding was different. The mere fact that the money deposited is not an ordinary general deposit, and is not subject to withdrawal by check of the depositor, is insufficient to rebut the presumption and to show an intention to make the deposit special. * * *." (Emphasis added; footnote omitted.)

■ In summation, because (1) the class consists of persons unfamiliar with banking practices (homeowners); (2) borrowers were not informed of defendant's use of the deposits; (3) defendant did not provide in the

---

According to the testimony of defendant's officer, the funds were designated as "* * * advance payments *on borrow* for taxes and insurance * * *." (Emphasis added.) Thus, the funds were labeled for accounting purposes as prepayments which were borrowed by defendant.

[ 556 ]

contract for its use of the money; (4) the contract was drawn by defendant and is one of adhesion; (5) the purpose of the particular deposits is limited to protecting defendant's security interest; and (6) no uniform practice exists concerning the use of the kind of deposits in question, it is our conclusion that the borrowers were entitled to any income from the use of the funds during the period of accumulation. The borrowers being so entitled, they would be deprived of what was justly theirs and defendant would be unjustly enriched were defendant permitted to keep the proceeds of the use of the funds.

Because courts have had difficulty with a legal rationale for recovery in similar cases, we will attempt to delineate ours. It is that of quasi-contract: an obligation implied in law which is not consensual. It is a remedial device which the law affords to accomplish substantial justice by preventing unjust enrichment.

> "* * * The implied in law contract is indeed no contract at all, it is simply a rule of law that requires restitution to the plaintiff of something that came into defendant's hands but belongs to the plaintiff in some sense. Yet it is called a contract implied in law, or a quasi-contract. * * *." Dobbs, Remedies § 4.2 at 235 (1973).

The Restatement of Restitution § 125(1) covers the situation:

> "A person who, as the holder of a title to property in which another has the beneficial interest, receives a direct product of the property, income or other proceeds from it, is under a duty to account to the other."

Defendant had title to the funds, but borrowers had the beneficial interest in the deposits until the time came to pay taxes and insurance premiums. They had this interest because its transfer was unnecessary to the accomplishment of the purposes for which the deposits were created, and because the agreements, which were drawn by defendant to its required form, made no provision for the transfer of the beneficial

interest, though it was defendant's uncommunicated intention to use the funds for its own benefit during their period of accumulation.

■ The protagonists in this case have used citations of authority in the language of both quasi-contracts and constructive trusts. Quasi-contracts and constructive trusts are parallel means at law and equity, respectively, of accomplishing substantial justice by preventing unjust enrichment and forcing restitution to the plaintiff of something which in equity and good conscience did not belong to the defendant. It is only proper to use a constructive trust when there is some specific property identified as belonging to the plaintiff. When the possession of no specific identifiable property is sought and only a money judgment is requested, quasi-contract is the remedy. As stated by Professor Lacy in *Constructive Trusts and Equitable Liens in Iowa,* 40 Iowa L Rev 107, 114 (1954):

> "The vital distinction between a quasi-contractual obligation and a constructive trust is that the former is purely personal and is enforced by a money judgment while the latter involves the creation of an equitable property interest in some thing. * * * [U]nless the *res* is land or a unique chattel or the transferee is insolvent, it is unlikely that specific recovery may be had from him. In any case where a constructive trust might properly be imposed against a transferee, he will also be under a quasi-contractual obligation which will in many cases furnish an adequate remedy. * * *." (Footnote omitted.)

The rationale of the two remedies is identical, and the citations of authority from both sources are relevant. In the present case only a money judgment is requested, and there is no need to resort to a constructive trust. However, we are in equity in this case because an accounting is requested.

Although we talk of agreements being construed against the lender and of adhesion agreements—concepts frequently associated with implied contractual provisions—we do not hold that defendant's obligation to pay borrowers the net proceeds of the use of

the money was contractual. We conclude that the subject of the use of the funds did not occur to borrowers and that defendant, without saying so, consciously intended to use the deposits for its own benefit. There was, therefore, no contract, actual or implied. Defendant's obligation is one imposed by law because, under all of the circumstances of the parties' relationship, in our opinion defendant would be unjustly enriched if allowed to retain the net proceeds generated by these funds. Among the relevant circumstances of the relationship are the facts that defendant drafted the contracts and that borrowers were not given an opportunity to negotiate their terms.

We realize that this is the first case in the United States by a court of last resort which has held after trial that borrowers have a right to recover in a case of this kind. There have been two decisions of courts of last resort which have upheld a complaint in a similar case as against an attack by demurrer. They are *Buchanan v. Brentwood Federal Savings & Loan Assn.,* 457 Pa 135, 320 A2d 117, 127 (1974), and *Carpenter v. Suffolk Franklin Savings Bank,* 362 Mass 770, 291 NE2d 609 (1973).[18] There are a considerable number of cases which have held to the contrary for various reasons.[19] Most of them can be distinguished

---

[18] *Carpenter v. Suffolk Franklin Savings Bank,* 362 Mass 770, 291 NE2d 609 (1973), was subsequently tried on the merits and judgment for defendant was affirmed on appeal. 76 Mass Adv Sh 1305, 346 NE2d 892 (1976).

[19] *See, e.g., Gibson v. First Federal Savings and Loan Assoc. of Detroit,* 364 F Supp 614, *aff'd.,* 504 F2d 826 (6th Cir 1974) (federal law does not require defendant to pay interest or earnings on reserve accounts, state law claims not heard); *Kinee v. Abraham Lincoln Federal Savings and Loan Assoc.,* 365 F Supp 975 (ED Pa 1973) (same); *Brooks v. Valley National Bank,* 113 Ariz 169, 548 P2d 1166 (1976) (absence of provision for payment of interest); *Marsh v. Home Federal Savings and Loan Assoc.,* 66 Cal App 3d 674, 136 Cal Rptr 180 (1977); *LaThrop v. Bell Federal Savings and Loans Assoc.,* 42 Ill App 3d 183, 355 NE2d 667 (1976); *Durkee v. Franklin Savings Assoc.,* 17 Ill App 3d 978, 309 NE2d 118 (1974); *Cale v. American National Bank,* 37 Ohio Misc 56, 66 Ohio Op2d 122, 124 (CP Cuyahoga Cty 1973) (absence of provision for payment of interest); *Richman v. Security Savings and Loan Assoc.,* 57 Wis2d 358, 204 NW2d 511 (1973).

[ 559 ]

upon the facts; with any that cannot be so distinguished, we disagree. Most of the cases which hold for the defendant do so upon the basis of custom, upon the absence of any provision in the agreement that the borrower will receive any recompense, or upon a particular wording of the security agreement which is different from the ones here involved.

Everything which has been said is applicable to FHA insured loans. In such cases the security agreements provide that defendant is to hold the deposit in trust instead of in a reserve account. An argument could be made that an express trust was contemplated; however, this position is unnecessary in view of our holding.

■ The conventional mortgage form used by defendant after February of 1972 poses an additional problem. It provides that the deposits will be "non-interest bearing." Borrowers of the class here involved would, in our opinion, equate interest from the money with any income the money would generate.[20] Therefore, the provision is the equivalent of an agreement that the deposits would not be the source of any income to the borrowers. Because borrowers agreed and knew, therefore, that there would be no income for them from the deposits during their period of accumulation, and because the question of the beneficial use of the funds during this time was thereby suggested to them, it is our conclusion that borrowers are in no position now to disown that to which they have agreed. That portion of the trial court's order is set aside which permits recovery by borrowers who signed the conventional mortgage form which included the "non-interest bearing" language.

■ Defendant also contends that because it did not require deposits for *insurance premiums* on loans of less than 80 per cent of the value of the property and

---

[20] See a subsequent portion of this opinion in which it is concluded that the Board contemplates "interest" in its most recent regulation as being the equivalent of any income from the deposits.

because the arrangement for reserve accounts in such circumstances was optional on the part of the borrower, there is no basis for a recovery of the income on those deposits. Defendant makes the same contention concerning deposits for insurance against other kinds of risks, such as mortgage life insurance and accident and disability insurance, for which voluntary deposits were made at the request of the borrower. It is our conclusion that as to all deposits for insurance which were *not required* by defendant (deposits for all taxes were required) and which were therefore voluntary, the borrowers should be excluded from recovery.

When the purpose of the deposit is for the security of defendant, there is a basis for a borrower to assume that the use of the deposit is so limited. On the other hand, if the sole purpose of the deposit is the convenience of the borrower and it is requested by him, there is a basis for an assumption that defendant will have the use of the deposit as its *quid pro quo.* A checking account is such an example. In addition, because the borrower is free to accept or reject the provision for the reserve account, it is not such a situation as would result in a contract of adhesion. Insofar as the order of the trial court may be construed to include those accounts, the order is set aside.

Another problem is the computation of the amount of the borrowers' recovery. There is no way to determine exactly the amount of defendant's earnings on the deposits since the money from the deposits was commingled with defendant's other funds for investment. There is evidence from which defendant's earnings from its direct loans on real property can be determined as well as evidence from which its yield on its portfolio of other investments can be ascertained. There is, however, no way to determine the amount of money from the deposits which was in each type of investment. Of course, funds for taxes had to be available at taxpaying time and this meant that sufficient investments in short term securities had to

be maintained for this purpose. These yields can vary from other investments.

The cost of servicing the accounts of deposited funds as of June 30, 1975, was estimated by defendant to be $4.87 per tax account and $4.58 per insurance account. The testimony was that this expense had steadily diminished through the years because of the gradually increased use of computers and that it was impossible to reconstruct the expense of maintaining the accounts for past years. Defendant also produced testimony that approximately one million dollars a year was advanced by it to make up deficiencies for borrowers in their tax accounts so that the three per cent tax discount for early payment could be secured. However, the expense of the advancement of these funds was computed in the average cost of servicing the accounts.

In addition to the servicing cost there was the expense of the investment and handling of the funds so that they would generate income. On top of all of this, defendant is required by the Board to maintain a reserve from accumulated profits which has to be a percentage of total savings accounts. As such accounts increase, profits have to be generated to maintain additional reserves so that the Board will permit defendant to continue to operate. This is also, in a way, an expense of doing business.

The trial judge looked at this complicated computation problem and resolved it with rough justice. He awarded income from the accounts to plaintiffs equal to the interest that was paid by defendant on ordinary pass book savings accounts. This is eminently sensible. The defendant is a mutual association. The total cost of all operations, including the maintenance of the reserve accounts as well as their investment, has necessarily been deducted from income before payment of such pass book interest. The deposits in question were completely commingled with defendant's other invested funds. The costs of servicing the

accounts and investing the funds were not capable of being isolated as separate components of defendant's total expenses. It is true that the Board, and not defendant, sets the rates for pass book savings accounts. However, these rates are presumably set by the Board with a view to allowing defendant to pay expenses, to maintain the necessary reserves, and thus to perform the functions for which it was created. Lack of availablilty of evidence from which one can be completely accurate about computation of earnings does not prevent borrowers from prevailing when recovery is otherwise proper.[21]

The borrowers cross-appeal from the trial court's decision on this point and contend that they are entitled to recovery at the legal rate of interest on the deposited funds. The appropriate measure of damages is the income generated by the use of the deposits less defendant's costs attributable thereto. It is not the legal rate of interest. It is our opinion that the method used by the trial judge more accurately represents defendant's gain than does the legal rate of interest or a futile attempt to compute the actual gain from the available information by determining the amount of income generated by the deposits and deducting the expense attributable thereto.[22]

Plaintiff cites authority to the effect that a *cestui que* trust may elect between actual earnings and

---

[21] 5 Corbin on Contracts § 10 at 125-26 (1964) says:

"There are many cases in which, by reason of the ordinary experience and belief of mankind, the trial court is convinced that substantial pecuniary harm has been inflicted, even though its amount in dollars is incapable of proof. If the defendant had reason to foresee this kind of harm and the difficulty of proving its amount, the injured party will not be denied a remedy in damages because of the lack of certainty. * * *." (Footnote omitted.)

This is a contract measure of damages. We believe its theory is appropriate here because the recovery results from our interpretation of the rights of the parties arising out of a contractual relationship. A quasi-contract is only a remedial device.

[22] Plaintiff's cross-appeal asks only that the legal rate of interest be assessed. It does not ask that an attempt be made to compute the actual profit.

[ 563 ]

interest where trust funds have been used by the trustee for his own purposes.[23] This authority is not controlling here. The present case does not deal with misuse of a trust res; we have merely held that the borrowers are entitled to quasi-contractual recovery of funds to which defendant is not entitled. Defendant was under no duty to make the reserve deposits profitable for borrowers, but it was not empowered to derive a profit from them for itself. Since it has done so, we have determined that borrowers are entitled to the sums so earned. Ordering an accounting on earnings from the deposits at pass book rates is a method of determining the extent of the profits as closely as possible. We conclude it is the appropriate measure of recovery in this case.

Defendant also contends that the trial court erred in failing to terminate defendant's duty to account to members of the class upon the adoption of an amended regulation effective June 16, 1975. The regulation, 12 CFR § 545.6-11(c), is:

> "*Payment of interest on escrow accounts.* A Federal association which makes a loan on or after June 16, 1975 on the security of a single-family dwelling occupied or to be occupied by the borrower (except such a loan for which a bona fide commitment was made before that date) *shall pay interest* on any escrow account maintained in connection with such a loan (1) if there is in effect a specific statutory provision or provisions of the State in which such dwelling is located by or under which State-chartered savings and loan associations, mutual savings banks and similar institutions are generally required to pay interest on such escrow accounts, and (2) at not less than the rate required to be paid by such State-chartered institutions but not to exceed the rate being paid by the Federal association in its regular accounts (as defined in § 526.1 of this chapter). *Except as provided by contract, a Federal association shall have no obligation to pay interest on escrow accounts apart from*

---

[23] Bogert, The Law of Trusts and Trustees § 863 (2d ed 1962); Restatement (Second) of Trusts § 207(1).

[ 564 ]

*the duties imposed by this paragraph."* (Emphasis added.)

It would have been helpful if even one writing in this case were not ambiguous. The regulation is obviously so. It says that federal associations shall pay "interest" on deposits (1) where it contracts to do so and (2) where the deposits resulted from loans made after June 16, 1975, if state law requires state associations so to pay;[24] there is no obligation to pay interest on deposits other than those enumerated.

■ The first ambiguity is whether the Board intended to encompass income produced from the deposits or only interest. These are not the same. The borrowers' claim is one for income—not interest. Plaintiff argues the borrowers are entitled to interest in lieu of being able to compute the income accurately, but this does not alter the nature of their claim from one for income. Plaintiff contends that the regulation, since it mentions only interest, is not applicable to the borrowers' claims. It is our conclusion that it was the intent of the Board to include all payments which a federal association might be required to make. When it made the regulation the Board was undoubtedly looking at the adjudicated cases which speak mostly in terms of interest from the use of the money rather than of income, although the latter is what is actually involved. The regulation would not be too helpful in solving the problems to which it is obviously addressed if it were limited as borrowers suggest.

■ The second ambiguity is whether the language "no obligation to pay" in the last sentence of the regulation refers to deposits made as the result of all loans or of only those loans made after June 16, 1975. Was the provision intended to terminate any obligation to pay which resulted from loans made prior to the effective date of the amendment "except as provided by contract"? By the literal terms of the last sentence it does, and we believe this is what was intended. The entire

---

[24] *See* ORS 86.245 enacted Oregon Laws 1975, ch 337, § 8.

thrust of the regulation seems to be to lay to rest the obligations of federal associations to pay for the use of deposits except in enumerated instances, and this could be accomplished only by the construction we adopt. Any other construction would permit the problem to linger on for the life of the most recent loan made prior to the effective date of the regulation.

■ The third ambiguity, as the regulation applies to the facts of this case, revolves around what is intended by the use of the term "contract" in the excerpt, "Except as provided by contract a Federal association shall have no obligation to pay * * *." Is defendant's obligation to pay, as required by this opinion, an obligation "provided by contract" so that it continues in existence after the adoption of the June 16, 1975, regulation? Defendant's obligation to pay in this case arose out of a contractual arrangement between it and its borrowers, but it did not arise out of an express or implied agreement. The duty was imposed by law from the circumstances of the transaction. Undoubtedly it was the uncommunicated intention of defendant not to pay. We think that it is more probable than not that the Board contemplated a knowing, intentional agreement by which a federal association obligated itself to pay. It would appear that the Board, by the provision, intended to allow the associations to pay interest if they desired. This option was probably granted for the purpose of allowing them to compete for business, if necessary. If such was the case, it would mean that the Board had in mind an intentional agreement to pay on the part of the associations.

■ We therefore conclude the trial judge was in error in not terminating defendant's obligation to pay interest on all accounts as of June 16, 1975.

■ It is next contended by defendant that the claims of members of the class are barred by laches and waiver. The rule concerning laches is stated in *Stephan v. Equitable S & L Ass'n.,* 268 Or 544, 569, 522 P2d 478 (1974):

[ 566 ]

"In order to constitute laches there must have been full knowledge of all of the facts, concurring with a delay for an unreasonable length of time, and laches does not start to run until such knowledge is shown to exist. *Wills v. Nehalem Coal Co.,* 52 Or 70, 89, 96 P 528 (1908); *Kelly v. Tracy,* 209 Or 153, 172, 305 P2d 411 (1956). In addition, the delay must result in substantial prejudice to the defendant to the extent that it would be inequitable to afford the relief sought against the party asserting laches as a defense. *Dahlhammer and Roelfs v. Schneider Exec.,* 197 Or 478, 498, 252 P2d 807 (1953); *Hanns v. Hanns,* 246 Or 282, 305, 423 P2d 499 (1967). Thus, the doctrine of laches is not an inflexible rule, but its application depends upon the particular circumstances of each case. * * *."

Defendant argues that class members have always been on notice that defendant does not pay for the use of the money in deposits because they received a notice each year showing all transactions in their accounts and no interest was included. Laches requires full knowledge and there is no evidence that the members of the class were aware that defendant was using the deposits for its own purposes during the period of accumulation.

In addition, it is difficult to discern the prejudice to defendant. It is in the business of borrowing money from depositors at pass book rates and of loaning it to others. Under the trial court's decree it only has to account at simple pass book rates. As a result defendant had more money to loan at its usual cost. Defendant claims the cost of maintaining an account for a pass book depositor and that of maintaining a reserve account for taxes or insurance premiums are not comparable. There is no evidence whether they are or not; but the facts are, obviously, within the knowledge of defendant alone.

Defendant's defense of waiver is subject to the same deficiency. A waiver can be made only with full knowledge, and there is no evidence that members of the class were aware of defendant's use of the deposits

for its own purposes during the period of accumulation.

Another of defendant's contentions is that because it is a mutual association, the burden of accounting will not fall on those who received earnings derived from the use of past deposits, which are in question here, but will fall upon present pass book depositors. Theoretically, this sounds fine; but if carried to its logical conclusion, it would result in defendant's being free of all claims for past obligations in that present, and not past, investors would have to pay for past obligations. We therefore ignore this contention.

Defendant says that Derenco, Inc., is not a proper representative of the plaintiff class since its claims are not "typical" of the class and that the case should therefore not be allowed to proceed as a class action. It would appear that Derenco has no claim for the use by defendant of an insurance premium deposit. However, the claims arising out of deposits for taxes and deposits for insurance premiums are sufficiently similar, in our opinion, that, for litigation purposes, a claim for taxes is typical of one for insurance, and that Derenco, Inc., is sufficiently representative of the class to protect both fairly and adequately the interests of all members of the class and is not disqualified from representing both groups of claims. ORS 13.220(1) (c) and (d).[25]

Defendant argues particularly that Derenco, Inc.'s, claims are not typical of those of the class because three different security instruments are involved in this litigation. Plaintiff, obviously, could have used only one in securing its loan. Because we have found

---

[25] "(1) One or more members of a class may sue or be sued as representative parties on behalf of all only if:

"* * * * *.

"(c) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

"(d) the representative parties will fairly and adequately protect the interests of the class; and

"* * * * *."

that the underlying bases for the claims are the same as to all security instruments under which borrowers are allowed by this opinion to recover, we hold that no impediment to class treatment exists.

Defendant vigorously contends that the situation is not a proper one for certification of a class action because questions of law and fact common to the members of the class do not predominate over questions affecting individual members. This contention is based upon the following statutory language of ORS 13.220(2) (c), which provides that a class action may be certified only if

"* * * [t]he court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members * * *. Common questions of law or fact shall not be deemed to predominate over questions affecting only individual members if the court finds it *likely that final determination of the action will require separate adjudications of the claims of numerous members of the class,* unless the separate adjudications relate primarily to the calculation of damages." (Emphasis added.)

Defendant raises several arguments intended to establish the likelihood of a need for separate adjudications of the claims of numerous members of the plaintiff class. It is our opinion that none of those points pose a bar to certification within the meaning of the statute.

It is first argued that the difference in the wording of the conventional mortgage form used since 1972 presents a need for numerous separate adjudications. We find this claim without merit. The reason for our conclusion is that the language change does not lead to a need for *numerous separate* adjudications because we have ruled as a matter of law that defendant owes no responsibility to any borrowers under this form.

Defendant next argues that the proffered defenses of laches and waiver present individual questions preventing certification of the class. As we have

already indicated, the evidence offered in support of these defenses is insufficient in that it fails to show that members of the class had the full knowledge of their rights required as an element of either defense. This lack of knowledge is further discussed in our subsequent treatment of what we consider to be the principal thrust of defendant's position.

Defendant's basic position arises from the borrowers' claims being the outgrowth of a contractual relationship. The relationship between each borrower and defendant could vary according to what each borrower knew concerning defendant's practice of using the deposits. Borrowers who, at the time of borrowing the money, knew of defendant's use would be bound by their knowledge. It is plaintiff's burden to demonstrate that it is not "likely" that separate adjudications will be required to resolve this issue in "numerous" instances.

In *Bernard v. First Nat'l. Bank,* 275 Or 145, 550 P2d 1203 (1976), we considered a similar problem concerning the knowledge of borrowers of the custom of banks in charging interest. Based upon the evidence in that case we held that the probabilities were that sufficiently numerous members of the class had knowledge of the banks' method of charging interest to justify an individual inquiry in each case and that the situation was therefore inappropriate for a class action. We said, 275 Or at 157-59:

> "This brings us to the principal question in the case. Is it 'likely' that final determination will require as to 'numerous' claims a separate adjudication of each claimant's knowledge of the banks' method of computing interest? If a claimant had knowledge at the time he secured his loan that the bank was intending to compute interest thereon by the 365/360 method, or if he had information which would put him on inquiry as to the method of computation, he would not be entitled to recover, because computation by the 365/360 basis would be a term of the contract with respect to such borrowers.
> "* * * * *.

"If plaintiffs have presented a case which is otherwise proper for a class action, it would be unreasonable to construe the statute to mean that defendants can automatically prevent such an action from proceeding by dreaming up a theoretical defense requiring individual inquiries, for which there is little basis in fact. The language of the statute, '* * * if the court finds it likely that final determination * * * will require separate adjudications of the claims of numerous members of the class,' indicates that the legislature intended that the court, in ruling whether it is proper to proceed with any class action, has the obligation to decide if a defendant is pressing an issue or a defense which possesses sufficient basis and substance to justify its litigation in 'numerous' instances or merely an issue or defense which is being presented for the sole purpose of avoiding a class action. * * *.

"On the other hand, if, at the time the court must first rule on whether the case may proceed as a class action, it appears probable that an issue or a defense which requires a separate adjudication as to each claim does have substance in enough instances to justify the defendants' asserting it, we believe the legislature intended that the case should not proceed as a class action. To hold that a case may proceed as a class action when there appears to be a legitimate issue or defense which will require an individual inquiry of a considerable number of the claimants would attribute to the legislature an intention either to overload the courts with an unmanageable proceeding or to deprive the defendants of valuable procedural and substantive rights by preventing them from asserting what appears to be a bona fide defense. * * *."

In our prior discussion in this opinion of the borrowers' knowledge of custom, we referred to the testimony of defendant's loan officer concerning the frequency of inquiries by borrowers about earnings from the deposits, which testimony indicated that the instances in which the question of the use of the money even occurred to borrowers were isolated and infrequent. Also, we draw the inference from the documents which borrowers were required to execute

[ 571 ]

and from the testimony that borrowers were not told of defendant's use of the money.

In addition, we have a different situation here than we did in *Bernard.* The class in the instant case is made up of homeowners, whereas *Bernard* dealt with a class of "commercial" loan borrowers. Although the loans in that case were not all strictly commercial (in fact, the majority of them were not), nevertheless, the evidence indicated there were a substantial number of such borrowers who, it was reasonable to assume, likely would have had knowledge of the banks' method of charging interest. We conclude from the evidence in this case that the contrary is true concerning the knowledge of members of the class about defendant's use of the deposits for its own benefit. As is indicated from a previous quotation from Scott on Trusts, it is probable that few borrowers ever thought of the matter at all, and it is reasonably certain that "numerous" of their numbers were not told of it.

It would be difficult to imagine a situation in which the circumstances surrounding separate contracts were more likely to be the same as they are in the present case. We have a uniform class of borrowers who were submitted an identical (insofar as material here) adhesion contract under strictly regimented procedures. The only unknown factor is the knowledge of each borrower concerning the use of the deposits by defendant for its own purposes. It is our conclusion that the proof here indicates that it is "unlikely" that "numerous" members of the class possessed such knowledge or that the subject of the beneficial interest in the funds even occurred to them. It is therefore proper that this proceeding continue as a class action. In answer to the possible argument that no claims arising out of separate contractual situations are proper for class action treatment, we acknowledge that there is no doubt they present special problems. However, had it been the intention of the legislature to exclude contractual situations from class action relief,

we believe it would have said so. We doubt that a situation otherwise suitable for a class action will ever be found where there is a greater probability of identity of separate contractual circumstances than that which exists in this case.

The decree requiring defendant to account is affirmed as modified, and the case is remanded to the trial court for an accounting in conformance with this opinion.