**Cynthia A. MORSE and**
**Allen E. MORSE, Plaintiffs**
**vs.**
**MUTUAL FEDERAL SAVINGS &**
**LOAN ASSOCIATION OF WHITMAN,**
**Defendant**

**No. 79-1966-A**

United States District Court
Commonwealth of Massachusetts

**February 3, 1982**

Peter H. Sutton, Paul S. Samson, counsel for plaintiff.

Terry O'Malley, Mark L. Sullivan, counsel for defendant.

## OPINION

**Aldrich, Senior Circuit Judge.\*** In 1978 plaintiffs Allen and Cynthia Morse owned a house in Halifax, Massachusetts. It was jointly mortgaged to defendant, Mutual Federal Savings and Loan Association of Whitman. Plaintiffs also had a joint Now checking account with defendant. In 1979 a friendly relationship between the parties developed into deep trouble because of carelessness on the part of Allen, in turn matched by over-reaction on the part of defendant. Suit was brought in this court by the Morses, alleging two federal claims, and a large number of dependent state claims. Although the basic federal claims were of no account, unfortunately a predecessor on this Court denied defendant's motion for summary judgment, and elected to retain pendent jurisdiction as to the balance although there were principally involved difficult questions of Massachusetts law which should better have been assigned to me for trial it seemed late to make the change, and I did not do so. To isolate these questions, with the parties' approval I put thirteen special questions to the jury on liability, and thereafter a number on damages. While the latter raise some problems, to the jury's credit its answers on liability were, in my opinion, both consistent and reasonable. Based on these answers, and the undisputed facts, I recite the following.

Allen, since 1973, had leased an Amoco filling station and garage from Buckley Heating Company, from whom he also bought his gasoline, oil and supplies. He ran it mostly single-handed, with help from Cynthia, but not as a joint enterprise. Although in one sense he was doing well, he increasingly had difficulties meeting his weekly, and later more frequent, payments due Buckley. Buckley insisted upon receiving cash, or a cashier's check, measured by the gallons sold as shown on the pumps' meters, current to the very day before. Allen had a checking account with the Rockland Trust Company, but it was more convenient to get his last-minute cashier's check from defendant. His practice was to give defendant a personal check on the Rockland bank, for which, quite apparently largely as a favor to a customer (whether there was a charge does not appear), defendant would give him a cashier's check, which he would give Buckley. The extent of this favor is quite apparent, because between February 1 and 4, 1979, defendant, at its branch office, so issued some $8,600 in cashier's checks, in effect unsecured loans totalling almost the size of the mortgage, and roughly four times the amount of the Now account. Earlier during January, Allen had been overdrawing his Rockland account. All four checks he gave defendant for the $8,600 were returned unpaid.

---

\* Sitting by designation.

Allen responded to a telephone call and came to defendant's main office on February 12, where he had a conversation with a Mr. Leetch, vice president and treasurer. He told Leetch that he believed that Rockland had erred, and that he wanted to investigate. Leetch agreed. In response to a question of what was defendant's procedure in the case of bad checks, Leetch said that it took various forms, including the institution of criminal proceedings if there was believed to have been fraud. Leetch testified that, in fact, he believed there was no fraud here, but he did not tell this to Allen. The jury found that while Allen reasonably construed the conversation as a threat of possible criminal proceedings, Leetch's conduct was not knowingly or wilfully unfair. It further found that it caused neither plaintiff any damages.

Allen, before leaving, gave Leetch $1,950 in cash to reduce the bad check indebtedness. Leetch testified he told Allen he would add the rest ($6,650) to the mortgage. This was done, on the records, on February 13. While Leetch testified that Allen agreed to this, the jury found he did not. Nor was there evidence that Cynthia agreed. Accordingly, defendant had no conceivable right to attach the mortgage security to this debt, even with the somewhat limited, and secondary, effect that it maintains was its purpose.[1] This impropriety was not cured by defendant's persuading Allen to sign a note for $6,650 on February 23, payable March 15, to which, later, Cynthia added her signature. The given purpose was to relieve the immediacy of the bad check indebtedness; defendant concedes, as it must, that it did not establish an enforceable lien on the Morse's home. Since the note was a substitute for a presently due debt of Allen only (the jury having found that Cynthia was not a joint venturer), Cynthia is to be regarded as a surety or guarantor. Consistent with its finding of no damages from the believed threat, the jury found that both Allen and Cynthia would have signed the note regardless of Leetch's remarks about criminal proceedings. The note, consequently, was valid as to both, Mass. G.L.c. 106 § 3-408; **cf. Mohan v. Woburn Nat'l Bank,** 1943, 313 Mass. 306, Cynthia's consideration being the perceived benefit to Allen of her signing.

When the note was not paid on March 15 defendant "froze" or "attached" their joint Now account without notifying plaintiffs of its action. As a result, eight checks drawn on the account by Allen were dishonored. Defendant now seeks to justify the freezing, and the dishonor of the checks, as a "set off." It did not, however, actually set off the proceeds of the account, some $2,020, until June 5. It argues that this was a mere technicality, but this is not so. Until June defendant charged plaintiffs 9.5 percent interest on the entire bad check indebtedness, including the amount that there should have been set off in March, while, at the same time, it deprived them of the use of their Now account.[2] The claimed set off was improper. Mass. G.L.c. 106 § 4-303; **Raymer v. Bay State Nat'l Bank,** 1981 Mass. Adv. Sh. 1870, 1875-76, 424 N.E.2d 515, and the checks were wrongfully dishonored. **Id.** Even had it been proper, it was inexcusable for defendant not to have advised plaintiffs immediately of its action.

Monthly payments of $200 were due on the mortgage, with an acceleration clause in the case of 60 days' default. The February 1, 1979 payment had not been made. On March 17 plaintiffs sent their 18-year old daughter to defendant's branch office with $200 in cash. Pursuant to some standing instructions, it was not accepted, and she was told to go to the main office. However, the branch office did not give her back the mortgage book.

---

1. The entries on plaintiffs' mortgage book show that defendant also proceeded to charge them interest at 9.5 percent on the entire mortgage balance, including the bad check indebtedness. See post. Unpaid interest was added to the mortgage principal.

2. During this period defendant did credit plaintiffs with interest on the Now account, but at the lower rate of 5 percent.

Plaintiff did nothing further. After April 1, the February payment being, in defendant's view 60 days overdue, defendant's committee, voted to initiate foreclosure proceedings, and this was done. A foreclosure sale was then advertised in a local paper.

Plaintiffs received no notice that defendant did not consider their daughter's bringing the $200 to the branch office on March 17 a proper tender. As matter of law, defendant was wrong. Plaintiffs regularly dealt with the branch office; they did not have to make a second tender at the main office, or face what, in view of the refusal, they feared they might meet there. Accordingly, the mortgage was not 60 days in default, and defendant had no right to foreclose or to publish a notice of foreclosure. Moreover, the jury warrantably found that defendant acted in bad faith, in that it brought the foreclosure proceedings for the ulterior purpose of collecting the bad check indebtedness. While plaintiffs' theory that this was an abuse of process must fail because foreclosure by statutory power of sale does not involve sufficient "legal process," **Jones v. Brockton Public Markets, Inc.**, 1975, 369 Mass. 387; see, **Beaton v. Land Court**, 1975, 367 Mass. 385, appeal dismissed, 423 U.S. 806, they have made out an action in tort for wrongful foreclosure. See, e.g., **Sandler v. Green**, 1934, 287 Mass. 404, 407, **Siegel v. Knott**, 1944, 316 Mass. 526. However unhappy defendant may justifiably have felt about the general situation, this action for that purpose was inexcusable.

Defendant was charged by the jury with further improprieties. Faced with foreclosure, plaintiffs obtained a postponement of the sale, and sought to refinance the mortgage and obtain a larger one for the purpose of making repairs and improvements. The National Bank of Wareham expressed willingness to an agreed larger sum, which left the necessary excess after paying all believed debts to defendant. Defendant, however, refused a discharge except upon the payment of a greater amount, which included the 1972 note, attorneys' fees, an escrow debit, and the 1979 note, all, apparently, with 9.5 percent compound interest, and another sum for which I cannot account. While there might be a dispute as to just how much larger, the amount demanded was substantially more than what was legally due. Because this was more than the Wareham bank had figured on, the new financing fell through. The jury warrantably found that defendant was wilfully or knowingly unfair in causing this to happen. Shortly thereafter, this suit was filed, and the foreclosure sale was put off pending its outcome.

One final matter. Plaintiffs sought an auto loan to finance a new car. The jury found that defendant furnished the lender with a credit report that was wilfully or knowingly unfair or deceptive. This resulted in several months' delay. However, the jury found no damages. I find nothing to criticize. When plaintiffs reapplied for the loan, they sought, and obtained, a much larger one, and bought a much better car. Evidently the jury found that that evened matters out. While plaintiffs claim that under Chapter 93A they should still receive attorney's fees, Cynthia faces an unsuperable obstacle. A condition precedent to recovery under section 9 of the statute is a demand. The present suit was already under way, but at the least the amended complaint could have contained a substitute procedure. Instead, the amendment did not even mention the statute.

Before considering the above in more detail, I note that the jury answered in defendant's favor Allen's claim that he lost the filling station lease because of defendant's conduct in freezing the Now account five months before. The only result of the freezing was that one check to Buckley in the amount of $169.30 was dishonored. Allen immediately rectified the deficiency. To claim that this led to Buckley's terminating five months later

when large arrearages developed, permitting the introduction, in colorful detail, of enormous losses by Allen, was not only totally frivolous, but, in view of Buckley's testimony and its records later introduced, I find it was sought to be supported by consciously false testimony, a matter to consider when determining the extent to charge defendant with Chapter 93A attorney's fees.

**Chapter 93A - Applicability to defendant**

In total, the jury found damages for four wrongful acts: 1) adding the bad check indebtedness to the mortgage; 2) freezing the Now account, and failing to give notice causing the dishonor of eight checks; 3) instituting foreclosure proceedings; and 4) preventing the refinancing of a new mortgage. It found that each was wilfully or knowingly unfair, but found that defendant's conduct was not extreme or outrageous. Plaintiffs, having complied, in these matters, with the preliminary statutory requirements, seek double, or triple (which I find unwarranted) damages under Mass. G.L.c. 93A. Defendant responds with the broad assertion that it is not subject to the statute. That the legislature did not intend to include it is effectively answered by the recent case of **Raymer v. Bay State Nat'l Bank, ante,** which applied the act to a national bank. There is no reason for regarding federal savings and loan associations differently.

Next, defendant contends that, as a matter of federal law, the statute is preempted by the Federal Home Owners' Loan Act, 12 U.S.C. § 1464(a), and various regulations promulgated by the Home Loan Bank Board thereunder. This is a more troublesome question. The Supremacy Clause dictates that when state and federal law conflict, state law must give way. The conflict need not be direct. A state law may be invalid because federal regulation of an area is so pervasive as to "occupy the field" and preempt state legislation by implication, e.g., **Parker v. Brown,** 1943, 317 U.S. 341, 350, or because it imposes an "undue burden" upon the performance of a federal instrumentality's functions, e.g.,

**Anderson Nat'l Bank v. Luckett,** 1944, 321 U.S. 233, 248. In the absence of any specific conflicting statute or regulation here, defendant argues implied preemption from Congress having generally occupied the field, a question as yet not determined in this circuit. See, **First Federal Savings & Loan Ass'n v. Greenwald,** 591 F.2d 417, 426 n. 16. (1st Cir. 1979) Although there is considerable dicta, defendant cites no case that goes that far.[3] The fact that federal statutes or regulations covering some aspects of a regulated area are, by necessity, complex and detailed, does not imply that Congress intended to occupy the entire field to the exclusion of state law. **De Canas v. Bica,** 1976, 424 U.S. 351, 359-60; **New York State Dep't of Social Services v. Dublino,** 1973, 413 U.S. 405, 415. There is no preemption when, as here, state law has its effect in an area which was "a merely peripheral concern of the (federal regulation),￼" **De Canas v. Bica, ante,** at 361 (quoting **San Diego Unions v. Garmon,** 1959, 359 U.S. 236, 243); **Derenco, Inc. v. Benjamin Franklin Savings & Loan Ass'n,** 1978, 281 Or. 533, 577 P.2d 477, 484, **cert. denied,** 439 U.S. 1051. Rather, defendant should have an affirmative burden to show inconsistency, or at least a possibility of conflict. A review of the regulations, 12 C.F.R. §§ 500.1-556, shows no such, either in the area of proscribed unfair or deceptive practices generally, or as to such traditionally state-regulated banking matters as set-offs, debt collection and foreclosures. Indeed, until July 23, 1979, when Congress enacted P.L. 96-37, amending section 57A of the Federal Trade Commission Act, 15 U.S.C. §§ 41-58, prime responsibility for regulating unfair or deceptive acts or practices by

---

3. **Conference of Federal Savings & Loan Ass'ns v. Stein,** 9 Cir., 1979, 604 F.2d 1256, **aff'd mem.,** 445 U.S. 921, held only that because of the substantial federal regulation, state-conferred rights could not be enforced against the association by a state regulatory body. It left open whether such rights could be enforced in a private lawsuit.

the associations rested not with the Home Loan Bank Board, but with the Federal Trade Commission. See, H.R.Rep. No. 265, 96th Cong., 1st Sess, (1979) U.S. Code Cong. & Adm. News 372.

The remaining question with respect to possible federal preemption is whether the state statute, by allowing double or treble damages, imposes an undue burden on the operations of federal savings and loan associations in Massachusetts. I conclude that in the context of the present case it does not. Although they are instruments of federal government, the associations are privately owned corporations, aiming to make a profit. As such, they "should comply with the business usages and ethnics required of others engaged in similar businesses within the state unless such usages and ethnics actually conflict or interfere with federal purposes or unless Congress or the federal regulatory body unmistakably indicates otherwise." **Derenco, Inc., ante,** 577 P.2d at 487. Here, as evidenced by 15 U.S.C. § 57a(f)(1), the state and federal purposes coincide rather than conflict. An award of Chapter 93A exemplary damages against defendant would no more threaten the ability of federal savings and loan associations to perform their functions in the Commonwealth than it would state-chartered savings and loan asociations, or other corporations subject to the statute.

## Cynthia
### The Federal Claims

Before dealing with the claims individually, it would be well to dispose of the federal ones. Only Cynthia has such. She asserts claims under the Truth in Lending Act (TILA), 15 U.S.C. §§ 1601-1667e, and the Equal Credit Opportunity Act (ECOA), 15 U.S.C. § 1691-1691f, both in connection with the 1979 promissory note. Neither has merit.

The claim under TILA is that defendant should have made certain disclosures when the note was signed, and Cynthia should have been allowed to rescind. The entire transaction, however, is exempt because the "extension of credit" underlying the 1979 note was for "business or commercial purposes." 15 U.S.C. § 1603(1). The ultimate purpose of the "credit" was to pay for supplies, see, **Poe v. First Nat'l Bank,** 1979, 5 Cir., 597 F.2d 895 (per curiam), and it is immaterial that Cynthia was not involved in running the business. **Id.; Lammerding v. Shawmut Community Bank,** 1980 Mass. App. Adv. Sh. 737, 402 N.E.2d 1085 (applying same language in section 2(a) of Massachusetts Truth in Lending Act, Chapter 140C §§ 1-13).

Cynthia's ECOA claim relies upon section 202.7(d) of Regulation B, 12 C.F.R. § 202, promulgated by the Federal Reserve Board pursuant to section 1691b of the Act. She argues that the bank discriminated against her on the basis of her marital status in requiring her to sign the 1979 note. This is a total misconception. Cynthia was not an "aggrieved applicant" for credit entitled to bring a private cause of action by 15 U.S.C. § 1691e(a). The debt was Allen's, and the note was an extension or renewal of credit to him. Cynthia signed only as a "guarantor, surety, endorser, or similar party." Regulation B, § 202.2(e). She is implicitly excluded from the statutory definition of an applicant, 15 U.S.C. § 1691a(b), and explicitly excluded by Regulation B, § 202.2(e). If requiring Cynthia's signature was improper (which, in light of defendant's many arguments seems doubtful), the affront was not to her, but to Allen, who was unable to secure "credit" without the signature of his wife.

## Cynthia
### Chapter 93A

With the exception of the delayed auto loan, already disposed of, all of plaintiffs' Chapter 93A claims arose prior to the statute's amendment, effective October, 1979. Cynthia has no claims under section 9 as it then read, having been a mere borrower of money, and not a purchaser or lessor of goods, services or property. **Murphy v. Charlestown Savings Bank,** 1980 Mass. Adv. Sh. 1323, 405 N.E.2d 954. Since the jury found her not to be a joint venturer in the filling station business with Allen, neither can she

qualify under section 11, which would require her to have been "engage(d) in the conduct of any trade or commerce."

## The Individual Claims - Damages

### 1. The adding of the bad check obligation to the mortgage.

The only direct injury suffered by plaintiffs from defendant's adding the bad check obligation to the mortgage was defendant's commencing to charge interest at the mortgage rate of 9.5 percent forthwith, instead of at the then statutory rate of 8 percent. As soon as the note was executed plaintiffs agreed therein to the mortgage rate, a practical ratification of that past, brief and miniscule, discrepancy. Indirectly, plaintiffs faced the threat that if they defaulted for sixty days in their $200 monthly payments, a figure not changed by the note, defendant's security interest, in case of foreclosure, would include the 1979 indebtedness in addition to the initial obligation. Since, however, defendant would doubtless seek to collect this indebtedness by way of attachment if it could not charge it directly, it is difficult to see how plaintiffs were harmed thereby. While, conceivably, some other creditor might get in ahead of defendant's attachment, the substitution of one creditor for another is not damaging to a debtor, even under the broad provisions of Chapter 93A. **Raymer v. Bay State Nat'l Bank, ante.** The only real possibilities of harm were that defendant might purport to foreclose on the mortgage for the nonpayment of the bad check obligation, or that plaintiffs would be in a poorer position to borrow money on the security of their house, by the claimed[4] reduction of their equity. Since those were both separately considered by the jury, and damages awarded when the harms materialized, see post, they are not pursued here. The minor excess interest charges alluded to above not having been paid by plaintiffs, defendant's bookkeeping would, at most, merely give them an action in contract for nominal damages, e.g., **King Features Syndicate, Inc. v. Cape Cod Broadcasting Co.,** 1945, 317 Mass. 652, 655; it would not entitle them to damages for mental suffering. **Stratton v. Posse Normal School of Gymnastics,** 1928, 265 Mass. 223.

While Cynthia has no Chapter 93A claim, Allen seeks damages for mental suffering under section 11. This the jury assessed at $3,270. Although Chapter 93A enlarged rights, I decline to hold that it added mental suffering to a claim sounding only in contract. If I am mistaken as to this, I set the mental damage awards (both as to Allen and as to Cynthia) aside as grossly excessive. Plaintiffs were naturally in an unhappy frame of mind. However, they had ample reason for which defendant was not at fault: the discovery that they did not have $8,600 that they thought they had, which as they operated, was serious money, and that they had given four bad checks to defendant, with whom they previously had had good relations, a matter which would naturally affect their standing at the Rockland bank as well. To say that they had mental suffering in an amount within $110 of the total net indebtedness they had wrongfully incurred, as a result of defendant's merely entering that sum on the mortgage book, I regard as totally unsupportable. If defendant had immediately attached the house, they would have had no damage whatever.

If I have erred in holding as matter of law that mental damages are not recoverable here, either under the statute or at common law, there must be a new trial as to the amount. However, despite only nominal damages, I award Allen's attorney's fees because attempting to add the bad check indebtedness to the mortgage was an unfair practice under section 2 of the statute. See, **Raymer v. Bay State Nat'l Bank, ante.**

---

4. There was no "on paper" lien satisfying the statute of frauds.

## 2. Freezing the Now account without notice.

Since there was no evidence that Cynthia had any independent source of income, and the evidence strongly indicated the contrary, without objection I put no question to the jury as to her actual damages from the freezing of the Now account. I did put mental suffering damage, as a hedge. However, I rule that as she drew no checks against the account that were dishonored she was not a "customer" of defendant under Mass. G.L.c. 106, § 4-402, and has no claim thereunder. Even if she had a claim, there was no evidence that she suffered any legally recognizable damage. She herself was not shown to have any business reputation to protect, and a wife cannot recover mental suffering resulting from her husband's loss of reputation. **White v. Spence,** 1977, 5 Mass. App. 679. Consequently, in the alternative, I set aside the jury's finding of $2,200 as grossly excessive.

Allen does have a claim here under Mass. G.L.c. 106, § 4-402. The statute's limitation to "actual damages" in case of dishonor due simply to mistake, whatever, in this context may be meant by "actual damages,"[5] is imapplicable, because the dishonor was not a "mistake." **Raymer v. Bay State Nat'l Bank,** ante. Consequently, Allen may recover "damages proximately caused" by the wrongful dishonor, which include mental suffering and loss of reputation. My difficulty relates to the amount. The jury found mental damages of $2,200 along with actual damages of $2,020.73, which latter was the exact amount of the account. The total checks came to $1,866, of which $1,598 were made out to cash, which Allen obtained from the Rockland Trust. His reputation could scarcely be high with that bank, where he had attempted to overdraw his account by $8,600, on top of other overdrawals shortly before. It is impossible to think that the other dishonored Now account checks, totalling $268 to individuals, injured him enough to come to $2,020.73 actual damages. Considering that the latter sum equals the total account, it seems far more likely that the jury was confused with respect to the actual damage. I also believe it included the injury to reputation in mental damages, as it clearly did in another matter, post. Bolstering this conclusion is the fact that $2,200 for mental damages, apart from injury to reputation, would be grossly excessive. Considering it as covering both aspects, this figure, although seemingly generous for what was involved, may stand, but I reduce the actual damage following the jury's apparent thinking as far as I believe permissible, to the amount of the dishonored checks payable to third parties, viz., $268.[6] If Allen is dissatisfied with this disposition, either now, or as the result of an appeal, he may have a new trial on the whole issue of damages for freezing the Now account.

Allen's total recovery on this claim is $268, plus $2,200, or $2,468, times two, or $4,936. The Massachusetts courts do not appear to have passed on whether Chapter 93A permits double damages for mental suffering, but I would prefer that the court above me refer the question, if it has doubts on the allowance.

---

5. The term "actual damages" can, in the vernacular, present a can of worms. In **Wiley v. Bunker Hill Nat'l Bank,** 1903, 183 Mass. 495, the court held that, even for a non-malicious dishonor, a "trader" could recover for presumed loss of reputation, without actual proof. Both the Massachusetts Code Comment and the Uniform Commercial Code Comment in section 4-402 state that the actual damage provision is to avoid that result. But cf. **Ellis v. Brockton Pub. Co.,** 1908, 198 Mass. 538, 543.

6. Allen testified that when the check to Buckley's in the amount of $169 was returned unpaid Buckley's representative appeared in hot haste, demanding, and receiving, immediate correction. Buckley's witness testified that he was satisfied with the explanation. In **Loucks v. Albuquerque Nat'l Bank,** 1966, 76 N.M. 735, 418 P.2d 191, cited with approval in **Raymer, ante,** on this point, the court affirmed a jury finding in the amount of the dishonored draft ($402). Since I have put mental suffering and reputation elsewhere, I consider that the amount of the checks is the maximum actual damages allowable on this record.

### 3. The attempted foreclosure.

Both plaintiffs have common law claims with respect to the attempted foreclosure. The jury found, as to each, $3,250 "mental damages," and "lawyer's fees" as "other damages." Lawyer's fees (apart from attorney's fees in the present action) are not recoverable even under Chapter 93A. **Kohl v. Silver Lake Motors, Inc.,** 1976, 369 Mass. 795, 801. There can be no problem with the other amounts. Where defendant's wrongful acts were a wilful misuse of its statutory power of sale, and could be expected to humiliate and distress plaintiffs, they may recover compensation for mental suffering. See, **Stiles v. Municipal Council,** 1919, 233 Mass. 174, 185; **Malone v. Belcher,** 1913, 216 Mass. 209, 212. Assuming that the jury understood "mental" damages to include defamation and loss of reputation (or else it cannot be found to have awarded any damages for such, in spite of plaintiffs' credible testimony) wrongly advertising a foreclosure can support an award of such damage. See, **Goss v. Needham Cooperative Bank,** 1942, 321 Mass. 309. Since the jury found the foreclosure was the bad check indebtedness to the mortgage was an unfair practice under secresulted from Allen's "trade or commerce," Allen's award on this issue, $3,250, is to be doubled, or $6,500; Cynthia, who has a claim apart from the statute, to receive $3,250.

### 4. Preventing refinancing.

Wilfully or knowingly interfering with plaintiffs' arrangement to refinance through the National Bank of Wareham, by demanding sums knowingly improperly charged against them, qualifies as an actionable tort for wrongful interference with an advantageous contractual arrangement. **E.g., Owen v. Williams,** 1948, 322 Mass 356; **Chemawa Country Gold, Inc. v. Wnuk,** 1990 Mass. App. Adv. Sh. 677, 402 N.E.2d 1069. The jury awarded $1,100 mental damages to each plaintiff, which are allowable. **Gould v. Kramer,** 1925, 253 Mass. 433, 439-40. Since, from Allen's standpoint the improper figures sprung from his business, he, again, can

claim under section 11. The loss of an opportunity to borrow a sum of money substantially exceeding his mortgage with defendant is a sufficient loss of "money or property" under the statute. See, **Baldassari v. Public Finance Trust,** 1975, 369 Mass. 33.

Damages here, Allen, $1,100, times two equals $2,200; Cynthia, $1,100.

### Miscellany

To avoid undue jury confusion, certain accounting issues were reserved for trial by the Court.

The parties disagree over whether, upon adding the bad check indebtedness to the mortgage balance in March, 1979, defendant proceeded to charge interest on the entire sum. The mortgage book conclusively demonstrates that it did, and at the mortgage rate for delinquent sums of 9.5 percent.[7]

Plaintiffs also claim that defendant improperly compounded interest on the 1972 mortgage note, resulting in charges substantially in excess of those contracted for. Defendant admits that it charged interest on interest, but says it did so only when plaintiffs' payments were delinquent, and cites the following provision of the note:

> "(O)n a loan which is delinquent by reason of the non-payment of any sum due the Association there may be charged an additional rate of interest but such additional charge shall not exceed per annum rate of one-half of one percent of the unpaid balance of the loan for the period of delinquency."

Purportedly pursuant to this provision, defendant, as shown by the mortgage book, charged 9.5 percent interest on

---

7. The book shows a balance of $16,180.92, which included the bad checks, and an interest charge of $128.10. Multiplying $16,180.92 by .095, and dividing by 12 to get one month's interest, one arrives at $128.10 to the penny.

both unpaid principal and unpaid interest, whenever the Morses missed a monthly payment. The note explicitly provides, however, that the basic annum interest rate of 9 percent is to be charged only "on unpaid principal." When defendant charged interest on interest during periods of delinquency it would appear to have been exceeding the maximum per annum charge permitted by the note.

At the same time, plaintiffs grossly exaggerate the effect of this practice. At least prior to March 1979, there was no continual compounding of interest, it occurred only during months when plaintiffs failed to make a payment. As soon as the delinquent payment was made, the interest that had been added to the principal would, in effect, be subtracted therefrom. Without taking space to repeat the calculations, this occurred some twenty-five times, with an overcharge of about $ .55 each time, or roughly $15 total.

I reserve further accounting matters to another hearing, notably what is due defendant on its counterclaim. On the complaint Allen is owed $13,636, plus interest and attorney's fees to be determined, and Cynthia $4,350, plus interest.

**Aldrich, Senior Circuit Judge**